**Howard Able SAMPSON, Petitioner,**

v.

**STATE of Tennessee, Respondent.**

Supreme Court of Tennessee.

July 5, 1977.

Knox Bigham, Lewisburg, for petitioner.

Robert E. Kendrick, Deputy Atty. Gen., David L. Raybin, Asst. Atty. Gen., Nashville, for respondent; Brooks McLemore, Atty. Gen., Nashville, of counsel.

## OPINION

HENRY, Justice.

In this criminal action, involving a conviction for murder in the second degree, we are called upon to determine whether to apply the ALI Model Penal Code test of criminal responsibility, as announced in *Graham v. State,* 547 S.W.2d 531 (Tenn. 1977), to a criminal conviction pre-dating *Graham.* We conclude that *Graham* is applicable and reverse and remand for a new trial.

### I.

### *Pertinent Factual Background*

The defendant pleaded not guilty by reason of insanity.

We omit any discussion of the evidence relating to the commission of the crime, because in our grant of certiorari we restricted consideration to the issues dealt with in this opinion. Suffice it to say, defendant killed a Lewisburg police officer under circumstances which would have justified a verdict of murder in the first degree, but for the question of mental competence.

Counsel[1] for the petitioner concedes in brief and at the bar of this Court during the course of oral argument that the defendant knew right from wrong and that the evidence, when tested by *M'Naghten,*[2] is sufficient to sustain a conviction. He insists, however, that the rejection of *M'Naghten,* and the application of the ALI Model Penal Code, as adopted in *Graham, supra,* results in the evidence preponderating against the verdict. Perhaps so, but subject to the proposition that the question is one for the determination of the jury.

Under the proof, and under either test, the jury would have been warranted in returning a verdict of guilty, or one of not guilty by reason of insanity. The only difference is the guidance given by the trial judge in his instructions.[3]

We turn now to the testimony as it relates to mental capacity. First, it should be noted that the proof shows that the defendant knew the difference between right and wrong. It is inferable that he knew the nature and quality of the act. It is impossible, however, to read this record without being convinced that this defendant suffered from mental difficulties.

The testimony is replete with examples of his fears, delusions, bizarre thoughts, odd actions, and disturbed and agitated state of mind. He had harassed the police department with reports of people trying to poison him. He seemed to have a fixation about poison, much testimony being offered to show that he constantly believed people were trying to blow poison into his house. He dusted his home with flour so that he might track people coming into his house. He feared that people were trying to kill him. On one occasion he called a representative of the county health department to come and examine his house fearing that he was about to be killed by poisonous gas. Another witness had seen flour strewn around the upstairs windows so that he might detect any entry. He believed that his cattle were being poisoned. A lawyer at the Lewisburg bar testified to conversations with him during which he insisted that he was being watched by an FBI man in disguise. He had also told him of sprinkling flour on the floor and letting himself out the back window so he could tell if anybody had walked on the floor. On occasions he would be afraid to sleep in his house and would go to the home of a neighbor and sleep in a car.

In 1973 he was diagnosed by Dr. William F. Orr, of the Mental Health Clinic in Lewisburg as suffering from "acute brain syndrome; questionable schizophrenic para-

---

1. Petitioner was declared indigent and was represented by court appointed counsel. The diligence and vigor of petitioner's counsel is in keeping with the highest traditions of the legal profession.

2. *M'Naghten's Case,* 1 C. & K. 130, 10 CL. & F. 200, 8 Eng.Rep. 718 (1843).

3. The trial judge in this case charged correctly on the two-pronged test of *M'Naghten.* See *Graham v. State, supra.*

noid." The Acting Director of the Clinic described petitioner as being "really spacey." A medical doctor who had treated him found him to be disturbed and agitated at times. Another medical doctor diagnosed him in 1973 as being a paranoid-schizophrenic.

We have attempted to analyze the abnormal thinking of this petitioner and his bizarre conduct as described by the lay witnesses in the light of the medical testimony.

Reference to Lawyer's Medical Cyclopedia, Revised Volume 3, Sec. 17.5, reveals that schizophrenia is "a severe emotional disorder characterized by the presence of delusions, hallucinations, or disturbances in the emotional sphere . . ." and that there are four reaction types. One of these is the paranoid type.

> In this reaction the individual has delusions of grandeur. He may misinterpret the behavior or speech of others around him. He may have hallucinations. As a result of his delusions and hallucinations he may be hostile and aggressive toward others.

In Guttmacher & Weihofen, Psychiatry and The Law (Norton & Co. 1952) at page 73, speaking of the schizophrenics and the schizophrenic type reactions, it is said:

> The outstanding features of these disorders are the bizarre thought content and the odd behavior of the patient, his apparent alienation from the world of reality, an apathetic flattening of mood which may at intervals be punctuated by apparently inappropriate periods of great intensity, the presence of delusions (false beliefs), illusions (false interpretations of stimuli), and hallucinations (perception of external stimuli not present).

And in Dr. Karl A. Menninger's book, The Human Mind (Alfred A. Knopf, 1959) at pages 86, 87 we find this apt exposition:

> Paranoid tendencies may develop into full-fledged *paranoia,* an insidious and malignant "insanity" characterized by a slowly progressing tendency to regard the whole world in the light of a system of delusions, chiefly delusions of persecution which enhance the importance of the

ego. First a feeling of being slighted and unappreciated and then of being avoided and disregarded, then of being watched and pursued, then slandered, insidiously attacked, openly attacked, plotted against, etc.

We do not hold that this defendant was a paranoid schizophrenic either as a matter of fact, of psychiatry or of law. We have cited these treatises along with the medical testimony to aid in our analysis of the lay testimony in the light of the medical testimony and generally accepted principles of psychiatry. This analysis has a direct bearing upon the application of *Graham v. State, supra.*

## II.

### *The Significance of Graham*

In *Graham,* we adopted the ALI Model Penal Code test of criminal responsibility. We laid down rules for its retroactive application. First, we said that the new standards would be applicable "in all criminal trials or re-trials beginning on or after the date of the release [January 31, 1977] of this opinion." 547 S.W.2d at 544.

Secondly, we held that for it to be applied retroactively it was necessary that "appropriate special requests" had been made or that the "issue otherwise [had been] fairly raised in the trial court and supported by competent and credible testimony." *Id.* In the instant case, the defendant tendered a special request patterned after *United States v. Smith,* 404 F.2d 720 (6th Cir. 1968). In fact the precise language from *Smith,* as set forth in our subsequent opinion in *Graham,* was the basis of the special request.

We find that all criteria of *Graham* governing retroactivity have been met. We specifically hold that there was "competent and credible" testimony from which the jury, if properly instructed, might have found the defendant not guilty by reason of insanity.

Subsequently, in *Graham* and in response to the state's petition to rehear, we said:

Nothing in this opinion is subject to the construction that all cases wherein an insanity defense was interposed will *ipso facto* be subject to retrial. 547 S.W.2d at 544.

This conclusion should have been obvious from our principal opinion and we think it was. We, of course, would not reverse and remand in any case wherein the plea of insanity was interposed and was not supported by competent and credible evidence.

For reasons which do not appear and which we are unable to fathom the state insists that "an insufficient evidentiary basis was present to reverse in that [*Graham*] case." This insistence is in the very face and teeth of the statement in concluding the opinion that "[w]e expressly do not reverse this particular case on the basis of the use of the *M'Naghten* Rules since the trial judge and the Court of Criminal Appeals correctly applied Tennessee Law." 547 S.W.2d at 544. This Court merely recognized an inherent unfairness in charging a trial judge with error in a case wherein he had correctly applied the law. We reversed for other error wherein we disagreed with the trial judge. The facts in *Graham*, as in this case, made out a jury question on the issue of insanity.

We, therefore, apply *Graham* because an appropriate special request was tendered and there was competent and credible evidence upon the issue of insanity.

### III.

#### Argument of Counsel

The trial of this case was marred by the prejudicial injection, as an issue of first magnitude, of the post-trial disposition of the defendant, first as related to the length of his sentence and secondly as to his disposition in the event of a finding of not guilty by reason of insanity.

The opening gambit came from the District Attorney General, who, in opening argument, told the jury:

> I ask you, in the interest of the people of this county and of the community, to put this man where he won't be *back out on*

the streets of Marshall County again. That, you know how it is, you send them down to the penitentiary, the *parole system*, they are back in a little while. . . (Emphasis supplied)

The General was interrupted by an objection not ruled upon by the trial judge. After the interruption he argued:

> If you find him guilty of murder in the second degree, he ought to get ninety-nine years, to let the people in the *Parole System* know that you don't want this . . . . (Emphasis supplied)

An objection was made and overruled. Whereupon, the General continued:

> Before we were interrupted, I asked you to let those in the *Parole System* know you don't want this man back *out on the streets* of Marshall County with a sentence that you deem sufficient; and I submit, a sentence, if you find him guilty of murder in the second degree, that he ought to get a sentence of ninety-nine years in order to insure that. (Emphasis supplied)

Defense counsel responded to the District Attorney General's "back out on the street" argument thusly:

> If you acquit him, if you bring in a verdict saying he's not guilty, that doesn't mean that he's going to be out here walking the streets. Because the law is, and I know that His Honor, the Court, will follow the law—the law is that if you find him not guilty because of insanity, this Court right here can commit him to a mental institution. And I'm confident in my mind that that's exactly what he'll do. So, I don't think that Mr. Kidd, nor you, nor I, nor anybody else needs to worry about you turning Howard Sampson loose and him being roaming around on the streets of Lewisburg tonight. I think I can assure you that regardless of what your verdict is—THAT will NOT happen!

This argument by defense counsel was not objected to and, indeed, it was not objectionable except to the limited and technical extent of the statement: "this court right here can commit him to a mental institution."

The law (Sec. 33–709, T.C.A.) at the time of this trial provided that when a criminal defendant is found not guilty by reason of insanity "the district attorney-general *may* seek hospitalization . . . if he determines hospitalization to be justified." In our recent case of *Graham v. State, supra* at 544, we criticized this law and recommended to the legislature that it "be changed so as to clothe the trial judge with the authority to cause the defendant to be committed to the custody of the Commissioner of Mental Health to be placed in an appropriate institution for custody, care and treatment."[4] While we recognized then that there were serious constitutional implications, we did not go into the specifics, choosing instead to speak in generalities.

The closing argument for the state does not appear in the Bill of Exceptions, and we have no way of determining to what extent it contributed to the charge of the court discussed in the next section.

### IV.

### *The Charge*

■ The trial judge charged the jury, in part as follows:

> Members of the jury, it has been argued by counsel as to the legal effect of a verdict of Not Guilty, or a verdict of Not Guilty because of insanity. The plea of the defendant is the general plea of Not Guilty. Under this plea, the defense of insanity at the time of the alleged act is an issue. If you find the defendant Not Guilty, or if you find the defendant Not Guilty because of insanity at the time of the alleged act; then, in either of these events *the defendant would be a free man.* And, the Court could not hold him nor have him placed in any hospital for the mentally ill or insane, unless a further hearing was held, and it was determined that the defendant was insane at this time. (Emphasis supplied)

We think this charge was plainly erroneous.

In the first place, it was not a complete statement of the law. Just as the argument made by defendant's counsel was technically incorrect in that it short-cut the necessity for a proceeding instituted by the attorney general, the charge of the court was incorrect in that it too failed to mention the procedure available to the state, leaving the impression that, come what may, the defendant would walk the streets as a free man. We cannot conceive of any District Attorney General not taking immediate action to secure the person of any defendant acquitted of murder by reason of insanity.

As observed by counsel for the defendant, "this instruction was erroneous, not so much for what was said, but because it was said by the trial judge at all and because *so much was left unsaid.*" (Emphasis supplied.)

While we have every confidence that the trial judge did not so intend, the fact remains that this portion of his charge tended to put the stamp of approval upon the district attorney-general's "back out on the street argument."

Here we have the reverse of the situation presented in *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976). There the defendant endeavored to persuade the trial judge to instruct the jury on the legal effect of a verdict of not guilty by reason of insanity. The majority opinion[5] observed that "the trial judge is not supposed to tell the jury what the legal effect of their verdict is."

---

4. The 1977 General Assembly, by Chapter 396, clarified the law with respect to commitment procedures when a defendant is found not guilty by reason of insanity. Under these circumstances "the criminal court shall order the person detained for diagnosis and evaluation for a minimum of 60 days and a maximum of 90 days in a hospital or treatment resource." See subsection 1(a). The ensuing subsection makes it the mandatory duty of the District Attorney General, following the diagnosis and evaluation, to petition the court for judicial hospitalization under the provisions of Sec. 33–604, T.C.A. This enactment fully meets the suggestions made by this Court in *Graham.*

5. The dissent was not directed to this portion of the Court's decision.

The Court further held [i]t is not relevant to the issue of petitioner's guilt or innocence." Further we noted that there are "so many options and alternatives available, depending upon the mental condition of the accused, it would be highly conjectural and would involve the jury in speculation as to what might happen to the accused." 540 S.W.2d at 648–649.

## V.

### The Farris Issue

◼ Petitioner also assigns as error the action of the trial judge in charging the provisions of Sec. 40–2707, T.C.A.

The instant case was tried on June 21, 1975, prior to the release of *Farris* [*Farris v. State,* 535 S.W.2d 608 (Tenn.1976)] in February 1976; however, at the time *Farris* was released direct review of this case was pending in the Court of Criminal Appeals and that court did not act until October 13, 1976. The conviction of the petitioner in this case had not become final, within the meaning of *Farris.*

We recently pointed out in *Adams v. State,* 547 S.W.2d 553, 556 (Tenn.1977) that on consideration of petitions for certiorari we have approached the *Farris* issue on an *ad hoc* basis and "[w]hen in our opinion, the *Farris* charge affected the length of the sentence we have taken corrective action."

In the context of this case, wherein the length of the sentence was argued to the jury on a "back out on the street" basis, we are of the opinion that the charge materially affected the results of the trial.

Reversed and remanded.

COOPER, C. J., FONES and BROCK, JJ., and LEECH, Special Judge, concur.