Douglas Macarthur FORBES, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

Nov. 21, 1977.

Thomas E. Cowan, Jr., Tucker, Cowan & LaPorte, Elizabethton, for petitioner.

Brooks McLemore, Jr., Atty. Gen., David L. Raybin, Asst. Atty. Gen., Lewis W. May, Dist. Atty. Gen., Nashville, for respondent.

## OPINION

HENRY, Justice.

We granted certiorari in this rape case in order to consider the question of the right of the trial judge to require that a rape victim submit to a psychological examination and to examine the issues of the sufficiency of the identification and of the alibi and insanity defenses.

Petitioner was convicted of rape and sentenced to serve fifty years in the State Penitentiary. The Court of Criminal Appeals affirmed. We granted certiorari to consider the matters indicated, thus rejecting all other issues presented in the petition for the writ of certiorari. Upon such consideration we concur in the results reached by the Court of Criminal Appeals and affirm the conviction.

This tragedy occurred at approximately 3:45 p. m. (EDST) on April 25, 1974, in the Johnson City residence of the victim, a twenty-five year old housewife and the mother of two children. As she entered her house after sunbathing in the backyard, she was confronted by her assailant who, brandishing a hunting knife, forced her upstairs, disrobed her, and at knifepoint, forced her to engage in fellatio, followed by intercourse, an effort to have anal intercourse, and then by further normal intercourse.

Defendant was identified and arrested on 1 August 1974, while a patient at Mountain Home Veterans Administration Hospital.

## I.

*Psychological Examination of the Victim*

On 2 December 1975, one day before the commencement of the trial, defendant moved the Court for an order directing the victim "to present herself for a psychological examination . . . to examine into her mental attitudes prior to trial [in order] to introduce expert testimony to impugn the credibility of the prosecutor and otherwise question her competency as a witness and truthfulness."

This motion was overruled at the time of its presentation, the Trial Judge stating: "[t]here is no right to have the alleged victim of a crime examined in Tennessee. . . . ." The Court of Criminal Appeals concurred in this conclusion, holding that "[t]here is no authority in Tennessee that a trial judge has the power, discretionary or otherwise, to compel such an examination."

It is true that we have no statute authorizing such a procedure and no decisional law precisely in point. We are unwilling, however, to conclude that the judge is totally lacking in power to order such an examination, upon motion timely made, and supported by compelling reasons or a showing of a particularized necessity for such an examination.

We similarly reject the notion advanced by Wigmore: [1]

No judge should ever let a sex offense charge go to the jury unless the female complainant's social history and mental makeup have been examined and testified to by a qualified physician.

We think a rule that would operate to make it mandatory that rape victims submit to psychological or psychiatric examinations would be contrary to public policy. A woman raped is shorn of all her dignity. She is the victim of the most humiliating, degrading and debasing of all crimes. We know judicially that an alarming percentage of rape victims never make public complaint. This must be attributed in substantial part to the fact that she is subjected to examination and cross-examination on the most intimate details of the penetration and must testify to matters that are not even discussed among intimate friends, but are the legitimate subject of inquiry in a courtroom crowded with the participants, the court's retinue and the curiosity seekers.

In Tennessee this testimony comes first at the preliminary hearing, second before the Grand Jury and lastly at the trial. To superimpose a further requirement of a mental examination would operate to compound the humiliation of this traumatic experience and to deter prosecution for this loathsome criminal act.

This question came before the California Supreme Court in *Ballard v. Superior Court of San Diego County*, 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416 (1966). After holding that a general rule requiring psychiatric examination of complaining witnesses in sex cases would be both unnecessary and inappropriate, the Court said:

Rather than formulate a fixed rule in this matter we believe that discretion should repose in the trial judge to order a psychiatric examination of the complaining witness in a case involving a sex violation if the defendant presents *a compelling reason* for such an examination. (Emphasis supplied). 49 Cal.Rptr. 313, 410 P.2d 849.

---

1. 3A Wigmore, Evidence, Sec. 924a (Chadbourn rev. 1970).

Following the full reporting of *Ballard*, there appears in 18 A.L.R.3d beginning on page 1433, an annotation headed "Requiring Complaining Witness in Prosecution for Sex Crimes to Submit to Psychiatric Examination." This annotation reveals that the general rule supports such examinations on a discretionary basis.

We hold that in any case involving a sex violation, the trial judge has the inherent power to compel a psychiatric or psychological examination of the victim, where such examination is necessary to insure a just and orderly disposition of the cause. Such power should be invoked only for the most compelling of reasons, all of which must be documented in the record. This discretion should be exercised sparingly.

Any such motion must be made on a timely basis. The rule we announced in *State v. Gaddis*, 530 S.W.2d 64 (Tenn.1975), is analogous:

> A motion for such inspection and analysis may be made at any time after arrest but must be made in ample time so as not to result in a postponement or continuance of the final hearing. 530 S.W.2d at 69.

See also *State v. Stephens*, 529 S.W.2d 712 (Tenn.1975).

In the instant case the record reveals no compelling reasons for ordering the victim to submit to a psychological examination. Moreover, the motion, made one day in advance of the trial, was not timely. For these reasons, the action of the trial judge in overruling petitioner's motion was correct.

## II.

### The Identification Issue

Petitioner assails the identification by the victim and strongly urges upon the Court his insistence that the in-court identification was tainted by an impermissibly suggestive out-of-court identification. We review the facts.

The victim first saw the petitioner in her residence on the date of the crime. She viewed him for ten or fifteen minutes in the closest proximity, under adequate lighting conditions, and gave the police a substantially correct description.

Subsequent to the rape a continuing investigation was conducted. The Sheriff was informed that a patient at Mountain Home Veterans Administration Hospital was a possible suspect. He conveyed this information to an assistant attorney general and an agent of the Tennessee Bureau of Investigation.

On July 29, 1974, the Sheriff, the Assistant District Attorney General and another representative of the District Attorney General's office, and the T.B.I. agent went to Mountain Home, where a conference was held with Dr. Neale. As a result of that conference, on the following day, July 30, 1974, the Assistant Attorney General and the T.B.I. agent took the victim to Mountain Home for the purpose of having her view the petitioner in a therapy session, through a two-way mirror. After further consultation, Dr. Neale refused to permit this procedure. He did, however, advise them of the route petitioner, along with other patients, would take in going to the evening meal.

Pursuant to this information the victim was taken to Mountain Home and viewed the cafeteria line from a parking lot. A hundred or so patients were in line, but petitioner was not one of them. Hence, there was no identification.

Thereafter, they were advised by Dr. Neale that the petitioner would be exercising in a specified area the following morning. Subsequently, Dr. Neale advised that the exercise session would be in the afternoon.

On the afternoon of August 1, 1974, some ninety-eight days after the assault, the victim, accompanied by her husband, the Assistant Attorney General, the T.B.I. agent, a photographer, and others, converged upon the designated location. Some five or six patients, of varying ages, were playing volley ball under the supervision of an orderly.

The victim positively identified the petitioner from a distance of about twenty-five feet. After doing so, she was driven past

the recreation area and then back by to a point some two hundred feet away, where, after studying petitioner through binoculars, she again identified him. All this occurred on a bright, sunny day.

Pursuant to this identification, petitioner was arrested.

The victim made a positive in-court identification without contemporaneous objection.

■ We should note, at the very outset, that since the identification occurred during the investigative phase and prior to arrest, we are not dealing with the Sixth Amendment right to counsel. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Thus, the issue here presented arises under the due process clause; and our consideration is limited to a determination of the single issue of whether it was so impermissibly suggestive as to give rise to "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968).

In our recent case of *Bennett v. State*, 530 S.W.2d 511 (Tenn.1975), we pointed out that "[t]he controlling law [relating to identification procedures] is of comparatively recent vintage" and recognized the departure in 1967 from the old rule that line-up procedures "went to the weight of the testimony and not its admissibility upon the trial," as a result of the great trilogy of cases decided in 1967 by the Supreme Court of the United States, viz.: *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

In *Stovall* the Court announced a "totality of the circumstances" rule, which was reaffirmed in *Simmons v. United States, supra*, and which we adopted and followed in *Bennett*. Also followed in *Bennett* were the factors laid down in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972), for consideration in evaluating the likelihood of misidentification:

■ the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

Holding that "reliability is the linchpin in determining the admissibility of identification testimony," the Supreme Court, in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977), specifically reaffirmed the factors set forth in *Neil v. Biggers, supra*.

We apply these factors to the instant case.

1. *The opportunity to view.* There can be no legitimate doubt that the victim had ample opportunity to view the petitioner and it is undisputed that she got a good look at him.

2. *The degree of attention.* The victim was not disinterested. As the Supreme Court said in an analogous situation in *Neil v. Biggers*:

She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. 409 U.S. at 200, 93 S.Ct. at 382–383, 34 L.Ed.2d at 412.

3. *The accuracy of the description.* The victim in this case gave a detailed description of her assailant and it was largely a correct description. There was some variance in estimated height, but we regard this as inconsequential in view of the overall accuracy of her description.

4. *The witness' level of certainty.* The record reflects that without prompting or suggestion, except to the extent that the setting of the identification involved an element of suggestiveness, the victim promptly, absolutely and unconditionally identified the petitioner and confirmed that identity by a second viewing and a third viewing by binoculars.

5. *The time between the crime and the confrontation.* The crime was committed on April 25, 1974; the identification was made on August 1, 1974, an elapsed time of ninety-eight days. In *Neil v. Biggers, supra,* seven months elapsed.

 It is evident that the show-up in this case was characterized by a degree of suggestiveness. This conclusion follows from the fact that the victim knew in advance of the identification that she would be viewing a suspect. The investigation had conditionally focused upon the petitioner. On the other hand, there is not the slightest semblance of impropriety by the State. The victim was a hospital patient. The line-up or show-up was necessarily confined to the hospital premises. Victim knew petitioner would be present among the group participating in calisthenics, but the record is clear that she participated in the procedure in an honest effort to make an accurate identification. And, it will be borne in mind that on the previous day, given the same opportunity, she made no identification.

Consideration also must be given to the fact that those charged with the investigation were confronted with a situation affording no alternatives. Without an identification an arrest could not be made. It was beyond their power to conduct a more reliable line-up procedure. While the procedure followed was inherently suggestive, we do not think it was impermissibly so. We cannot, on the record before us, and when consideration is given to the totality of the circumstances, find as a matter of law that there was "a very substantial likelihood of irreparable misidentification." We hold that the petitioner was not denied any right under the due process clause of the fourteenth amendment to the Constitution of the United States or under the analogous "law of the land" provision of Article 1, Section 8, Constitution of Tennessee.

### III.

#### The Alibi Defense

Petitioner presented an unusually strong alibi defense.

He testified positively that he did not know the victim and had never been in her house. He was on annual leave from his employment as a postal worker and testified positively that he did not leave his home in Carter County at any time during the afternoon of April 25, 1974. He was fully supported by his wife.

His strongest witness was a Mrs. Danner, wife of an Army Major and a resident of Carter County while her husband was on a "hardship" tour of duty in Cambodia. Petitioner's wife operated a baby-sitting or nursery service in the basement of her home. Mrs. Danner patronized this service and testified that on April 25, 1974, she left her children at petitioner's home at about 9:30 a. m. and picked them up sometime between 3:30 and 4:30 p. m. She testified that petitioner was present when she picked up her children.

The record suggests no clear reason that would support the jury's seeming rejection of her testimony. From a reading of the record it is apparent that she was an intelligent and articulate woman, with no motive to falsify. Indeed the distinguished District Attorney General knew both Mrs. Danner and her husband, and referred to her "as a fine lady."

Under a close and rigid but courteous cross examination she wavered to the extent of saying that "[i]t could have been another day, but I don't think so." The jury heard this testimony, and would have been warranted in reaching the conclusion that Mrs. Danner could have been mistaken as to the date.

There is yet another approach that the jury might have taken that did not involve a rejection. The proof is clear (1) that the crime was committed at 3:45 p. m., (2) that it continued for ten to fifteen minutes and (3) that it required 20–24 minutes [2] to travel from victim's residence to the home of the petitioner. The jury could have concluded that petitioner left the home of the victim

2. Stipulated.

at 3:55 p. m. and reached his own home at 4:15 p. m., thus validating Mrs. Danner's testimony.

■ Quite aside from the oft-quoted rule that the "verdict of the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflict in favor of the theory of the State", *McBee v. State*, 213 Tenn. 15, 20, 372 S.W.2d 173, 176 (1963), there is for consideration the fact that the credibility of alibi witnesses and the weight to be given their testimony are within the exclusive province of the jury, *Turner v. State*, 187 Tenn. 309, 213 S.W.2d 281 (1948). This Court only reverses criminal cases on the facts, when the evidence preponderates against the verdict and in favor of the innocence of the accused.

The evidence in this case does not preponderate against the rejection of the alibi defense.

## IV.

### *The Insanity Issue*

The most troublesome issue in this lawsuit is the insanity issue. The case was conducted under the *M'Naghten* Rules.[3]

Petitioner urges upon us the retroactive application of *Graham v. State*, 547 S.W.2d 531 (Tenn.1977), wherein we retreated from *M'Naghten*, and earlier Tennessee cases, and adopted the ALI Model Penal Code Test of Criminal Responsibility. We said that the new rule would be applied

(1) in all criminal trials or re-trials beginning on or after the date of the release of this opinion [Jan. 31, 1977] and (2) in all cases wherein appropriate special requests were submitted during the trial of the action, or the issue *otherwise was fairly raised* in the trial court and supported by competent and credible testimony, *and* the conviction has not become final. (Emphasis supplied). 547 S.W.2d at 544.

We apply these criteria to the instant case.

*First,* the trial was concluded on December 6, 1975, approximately fourteen months prior to the release of *Graham.*

*Secondly,* no special request was tendered incorporating the Model Penal Code Rule, or any other alternative to *M'Naghten.* To the contrary, counsel for the defendant tendered a special request which included a correct statement of *M'Naghten.*

■ *Thirdly,* the issue was not otherwise fairly raised. Petitioner's counsel treats the "issue" as being insanity. This is not a correct interpretation of *Graham.* The "issue" there contemplated was the correct test or standard of criminal responsibility. The phrase "or the issue otherwise was fairly raised in the trial court" was not defined in *Graham,* by design. We will not define it now. Its insertion was for the sole purpose of insuring that mere failure to make an appropriate special request would not *per se* operate to preclude the applicability of *Graham.*

■ Had any of petitioner's expert witnesses testified to capacity under the ALI Model Penal Code, or under any substantially similar standard, or had a tender of such testimony been made and overruled, the issue would have been "fairly raised in the trial court." Such was not the case. Here, the trial from proof to argument to charge proceeded solely under *M'Naghten,* and we, accordingly, decide the case under these rules.[4]

■ Petitioner complains of the trial judge's charge on insanity. At best the charge was a meager statement of the *M'Naghten* rules.[5] The trial judge defined insanity as being "a *perverted* and deranged condition of the mental and moral

---

**3.** *M'Naghten's Case,* 1 C. & K. 130, 10 C.L. & F. 200, 8 Eng.Rep. 718 (1843).

**4.** For a case involving retroactive application of *Graham, see Sampson v. State,* 553 S.W.2d 345 (Tenn.1977).

**5.** For correct statement of the rule, see 547 S.W.2d at 539 (verso).

faculties." We reject out-of-hand any suggestion that any person suffering from a mental disease is morally perverted. We would be inclined to reverse on this charge were it not for a subsequent development which we think cured the error. Counsel for the defendant submitted a most excellent special request setting forth fully and accurately the correct version of *M'Naghten*. The trial judge granted this request and this was the last item covered in the charge. The jury retired with this fresh on its mind. We think this cured the error.

We test the testimony under *M'Naghten* and apply thereto the established rules relating to the burden of the proof.

Massive testimony supports the defendant's theory that he was a long-time sufferer from the mental disease known as paranoid schizophrenia. We discussed the nature of this malady in *Sampson v. State*, 553 S.W.2d 345 (Tenn.1977).

We must consider this variety of mental disorder in the light of the established medical fact that it tends to be cyclic or periodic in nature and generally characterized by periods of remission. This is important to a proper analysis of the testimony. This characteristic is noted in P. Solomon and V. Patch, *Handbook of Psychiatry* (1974) at pages 187–188:

> With proper treatment, most schizophrenic patients will achieve some remission of symptoms after their first attack. However, one must distinguish between social recovery and complete disappearance of symptoms. Most patients hospitalized for the first time with the diagnosis of acute schizophrenic reaction can be expected to make a social recovery *in the sense that their chances are excellent for returning to their families and jobs*. The ultimate prognosis depends to some extent on the quantity and quality of continued treatment, the stresses to which the patient continues to be exposed, and the severity of the disease. With the advent of phenothiazine drugs and other modern treatment methods, schizophrenia has become for many patients *a disease of attacks and remissions*. (Emphasis supplied).

The same authority at page 170 states that "[v]ast numbers of schizophrenics *manage to function in the community* without ever being admitted to a psychiatric hospital." (Emphasis supplied).

One of the most authoritative [6] of all textbooks in the field, *Comprehensive Textbook of Psychology* —II (2d ed. Williams & Wilkins 1976), states that "[t]he paranoid patient usually conducts himself quite well socially" (903) and that "[t]he majority of schizophrenics today will emerge in the categories of sound remission with personality defect or full remission with relapses." (920).

Further in the same text it is stated that the schizophrenic is "best suited for quiet routine work he can perform independently from others and at his own pace." (920). It is significant to note that petitioner was a post office employee and delivered the mail over five different routes.

The same authority tells us that "[i]n most daily life situations the patient may, even socially, function at an apparently normal level." (920).

The testimony of the medical experts is consistent with these textbook principles and is replete with proof of periodic psychotic episodes, with periods of remission.

Three inescapable conclusions emerge from the proof, i. e. (1) that a paranoid schizophrenic is not legally insane under the *M'Naghten* rules when he is in a period of remission; (2) a prima facie case of legal insanity in such a case may only be established by proof that at the time of the crime the accused was not in remission; and (3) that proof of proper job functioning and normal appearance on the part of a paranoid schizophrenic is of questionable value.

The issue in this case boils down, first, to the single question of whether the proof shows that this defendant was not in remission on the date of this crime. If this question is resolved in favor of remission,

6. Used at Vanderbilt University School of Medicine.

the insanity defense is inappropriate. If resolved in favor of non-remission, then the two-pronged test of *M'Naghten* comes into play.

We resolve the first issue against defendant, therefore, the second need not be considered.

The record shows that petitioner had his first psychotic episode in June 1961, within a matter of days after he went on active duty with the United States Army and while stationed at Fort Knox, Kentucky. After a series of incidents he was placed in Ireland Army Hospital. His condition was diagnosed as schizophrenic reaction, paranoid type. He was transferred to Walter Reed General Hospital on July 19, 1961, where he remained for evaluation for about two weeks until he was returned to duty with a diagnosis of paranoid personality.

He then proceeded to run amok in the barracks, throwing his boots at the wall and talking and acting in a bizarre fashion. He was placed in the army stockade and transferred from there to Ireland Hospital, and then back to Walter Reed, with an admitting diagnosis of schizophrenic reaction, paranoid type. He was given electro-convulsive therapy (19 shock treatments). His final diagnosis was "schizophrenic reaction, paranoid type, acute, severe."

After a four-month stay at Walter Reed, he was found unfit for further military duty and was discharged from the Army on or about December 11, 1961.

He was seen in psychiatric consultation by Dr. George L. Gee of Knoxville on May 7, 1962, and was diagnosed as schizophrenic reaction in fair partial remission.

Following his release from the army, he took a six months business course in Knoxville, after which he stood a civil service examination, passed, and was employed in the Knoxville Post Office. He continued this employment for approximately four years and, at his own request, was transferred to the Johnson City Post Office, where he was employed on the date of the crime.

On April 25, 1967, he was found to be legally competent and capable of handling his own affairs. His mental condition was found to be "in good remission."

A principal witness offered by the defendant was Dr. Charles Walter, clinical and consulting psychologist with the Veterans Administration Hospital at Mountain Home. Dr. Walter began treating petitioner on November 29, 1972. At this time, he was suffering from anxiety and agitation, was dissatisfied with his life style, and was troubled with depression and obsessional thinking. He was unable to cope, had a feeling of inadequacy, and was sensitive to stress.

After the first three treatments, Dr. Walter diagnosed his condition as "a long term mental illness apparently of schizophrenic variety, and he was in some remission." By December 12, 1972, he had shown some improvement and by December 27, the improvement was "considerable". On January 11, 1973 and subsequently through February, he continued to show improvement. Finally on March 14, 1973, Dr. Walter felt that petitioner had passed through the "crisis" and treatment goals had been reached.

On August 3, 1973, he returned to Dr. Walter on his own initiative with some feelings of anxiety about his job and some dissatisfaction with his home life. He was treated with supportive therapy. He was next seen by Dr. Walter on November 20, 1973. Before this visit the Postmaster called Dr. Walter and reported that petitioner was "having trouble at work."

Dr. Walter next saw him on March 13, 1974, and found that he was "bored, feels bleak and uninterested in job or life." This was the last time Dr. Walter saw the petitioner before the rape incident on April 25, 1974.

Dr. Walter refused to give an opinion on sanity as of April 25, 1974, because "assuming this was a patient who, whose status would change rather rapidly, I do not think that I could venture anything more than speculation. . . ."

While Dr. Walter's testimony gives valuable insight into the nature of the petitioner's mental condition and demonstrates

clearly that his remission over the two year period he saw him before the rape incident was "rather fragile," it falls far short of making out a prima facie case of insanity on April 25, 1977. There is nothing in his testimony from which it might be inferred that petitioner was not in remission on that date.

Defendant next called Dr. A. Cooper Price, Chief Psychologist at Mountain Home. He first saw him on May 21, 1974, twenty-six days after the rape. Dr. Walter had advised him that petitioner's condition was of "long duration and cyclic." He had his "ups and downs." As a result of a consultation on June 6, 1974, forty-two days after the rape, Dr. Price felt that he was "approaching a psychotic break," and had developed chronic schizophrenia. His impression was that petitioner had had periodic psychotic episodes and that his condition fluctuated from time to time.

When asked to express an opinion under the *M'Naghten* standard, Dr. Price, after noting that he had examined all the past history of "being in and out of remission" and after noting the "cyclic" nature of the illness, said:

Since I didn't see him at that time, I would not really be certain as to whether he was or was not in remission. It would be, it would be impossible almost for me to categorize remission or non-remission.

Therefore, he declined to state whether the petitioner was sane or insane. He does make it clear that a paranoid schizophrenic may function normally depending upon the "degree of remission" and says that petitioner was probably functioning normally during the period April 22 through April 28, 1974.

Again, viewing Dr. Price's testimony in a light most favorable to the petitioner, it does not make out a prima facie case of insanity.

Dr. Jack Neale, Chief of Psychiatry at Mountain Home, testified for the defendant. He first saw the defendant on May 22, 1974, twenty-seven days after the rape and did not feel that he was psychotic at that time. Nor was he showing any of the actu-

al symptoms of paranoid schizophrenia. He saw him again on July 2, 1974, and again on July 16, 1974. At the latter time he felt that petitioner had become psychotic and hospitalized him on July 22, 1974.

When asked to express an opinion (under the *M'Naghten* standard) as of April 25, 1974, he responded:

It would just be impossible to speculate on that, on a date so distant from the time I saw him.

Dr. Neale confirmed the textbook principle that schizophrenia is a disease that has cycles. In response to questions by the District Attorney predicated upon the fact that up until a few days before the rape incident and within a few days after (petitioner was on leave on the date of the rape) petitioner was able to deliver the mail and function in an outwardly normal fashion, the Doctor said:

One can be delusioned and still sort and deliver mail. . . .

Again, while Dr. Neale's testimony gives insight into the nature of the disease, it furnishes no proof that defendant was not in remission, or insane, upon the date of the commission of the crime.

Lastly, the defendant called a husband and wife team of clinical psychologists, Dr. Nancy Lanthorn and Dr. Bruce Lanthorn.

They first saw petitioner on May 14, 1975, twelve months and nineteen days after the rape incident. Their testimony gives further and valuable insight into the nature of the illness and confirms the other expert witnesses and the medical literature on its cyclic or episode nature and on the ability of the paranoid schizophrenic to function with outward normality during periods of remission.

The testimony of this obviously highly qualified team of clinical psychologists was based upon exhaustive tests, examination of prior medical reports and upon lengthy personal interviews.

Specifically testifying within the framework of *Mc'Naghten*, Dr. Nancy Lanthorn first stated unequivocally that petitioner,

on April 25, 1977, "did not have sufficient mental capacity to appreciate the nature and quality of any acts committed in that period of time, or to know right from wrong." The jury obviously did not accept this conclusory and generalized testimony as being proof of non-remission. This follows from the fact that her testimony was somewhat diluted on cross-examination by this series of questions and responses:

Q. Well, I'm asking you if this man assuming that he is legally psychotic, as your diagnosis is, if he functioned as a rational, normal aware human being in his job on April the 22nd, and observed functioning this way, and then functioned that way on April the 27th, isn't it most likely and most probable that he was an aware human being, legally responsible under McNaughton on the 25th, the middle of that week, yes or no?

A. Okay, will you stipulate that he was not delusional?

Q. I'm not stipulating anything. I just asked you a question.

A. If what you say is true, then yes.

In connection with this testimony it should be noted that adequate proof supported the question propounded by the prosecutor.

Her testimony, however, makes clear her view that "functioning in a job does not equate to being psychotic or nonpsychotic, depending upon the nature of the job"; that "a person [paranoid schizophrenic] can do routine concrete activities; in fact prefers this kind of activity because of the very rigid structure, because of the nature of the job and still be able to do this and be very incompetent."

She further testified by affirmative response that a person "can still be psychotic and still be legally responsible under the M'Naughton Rule."

Dr. Bruce Lanthorn testified that paranoid schizophrenics "enter into long periods of remission in which their mental illness is fairly well controlled"; that they are able to function pretty well socially and vocationally.

Dr. Bruce Lanthorn testified that petitioner, on April 25, 1974, did not meet the M'Naghten criteria; however, he conceded that there is no known test "whereby you can look into a man's mind, thirteen months after a crime is committed, and state with any degree of medical certainty that that man knew right from wrong at a certain hour thirteen months before that."

We have read and examined all the medical testimony with interest and we accept it all at face value. It is clear that petitioner, for some twelve or thirteen years before the rape incident suffered from paranoid schizophrenia. It is equally clear that during most, if not all of this time, he was, as a minimum, in a partial state of remission. There is no proof in the record that he was in non-remission on April 25, 1974.

The issue, under M'Naghten is not whether petitioner is sane or insane, but whether he knew the nature and quality of the act he was doing and if so, that what he was doing was wrong.

To make that determination the basic issue, in this case, relates itself to the matter of remission, or non-remission and the degree thereof. Under the evidence in this record the jury was warranted in concluding that petitioner was in a state of remission on April 25, 1974. If the general progress of his disease prior to that date was leading in the direction of non-remission and if it be concluded that he was in partial remission on that date, there is still no proof of the extent thereof. .

 We do not depart from the established rule, reiterated as late as in *Graham v. State, supra,* that if the proof raises a reasonable doubt as to the defendant's sanity, the burden of proof rests on the State to establish sanity to the satisfaction of the jury and beyond a reasonable doubt. We think this rule does not come into play, in the context of this case.

 It is our view that when any defendant, suffering from a mental illness that is cyclic, periodic or episodic in nature, characterized by periods of remission, inter-

poses a plea of not guilty by reason of insanity, it is incumbent upon him to make out a prima facie case of insanity by offering evidence of non-remission at the time of the commission of the crime. To hold that general proof of such a mental illness, without proof of non-remission, operates to shift the burden of going forward with the proof to the prosecution, would cast an unfair and impossible burden upon the state.

We close this opinion with the observation that this trial was characterized by advocacy in its highest and best form. We are impressed that the District Attorney General prosecuted with force and vigor and yet the entire prosecution was marked by courtesy and fairness. Counsel for the petitioner represented his client in keeping with the highest standards of the legal profession. The trial judge presided ably and judiciously. This defendant not only had a fair trial, we think he had a well nigh perfect trial. Strong adversaries make strong issues. As indicated in this opinion some of them were difficult of resolution. We are satisfied with the results of the trial and our resolution of the issues.

Affirmed.

COOPER, C. J., and FONES, BROCK and HARBISON, JJ., concur.