IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2003

## STATE OF TENNESSEE v. JOHNNIE W. REEVES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-C-1889    Steve R. Dozier, Judge**

_____

**No. M2002-02371-CCA-R3-CD - Filed August 26, 2003**

_____

A Davidson County jury convicted the defendant, Johnnie W. Reeves, of two counts of aggravated child abuse of a child six years of age or less. The trial court imposed two concurrent twenty-year sentences. On appeal, the defendant contends: (1) the evidence was insufficient to support the convictions; and (2) the trial court erred in admitting certain photographs of the victim's injuries. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

David A. Collins (on appeal) and Barry R. Tidwell (at trial), Nashville, Tennessee, for the appellant, Johnnie W. Reeves.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian K. Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was convicted of two counts of aggravated child abuse of a child six years of age or less for choking the victim, W.R.,[1] with a dog leash and hitting him on his buttocks with a wooden board, both incidents occurring on June 16, 2000. The victim testified he was six years old at the time of trial and four or five years old when the events occurred. He stated that when the incidents occurred, he was living with his grandmother, his mother, and "Johnnie."

The victim testified that on one occasion while he and "Johnnie" were alone inside the residence, "Johnnie" placed a dog leash around his neck and instructed him to stick his fingers down

---

[1]In accordance with this court's policy, we refer to victims of child abuse by their initials.

his throat. "Johnnie" then yanked the dog leash around the victim's neck "four or five . . . maybe ten" times. The victim stated "[i]t hurt and felt like some blood was getting [sic] to . . . bust out." He then fell on the floor. The victim testified his neck was bruised as a result, and he denied causing the injuries himself.

The victim testified that on the same day, "Johnnie" spanked him on his buttocks with a black shelf from the entertainment center. He stated "Johnnie" spanked him with the board "[a] lot of times," and each time "Johnnie" spanked him, he fell on the floor. The victim further stated the spankings "hurt" and caused bruises on his buttocks. He testified "Johnnie" was the only person who ever spanked him with the board. Although the victim was unable to identify the defendant as "Johnnie" at trial, he stated only one person named "Johnnie" ever lived with his family.

Lydia Roberts, the victim's grandmother, testified that during the summer of 2000, the defendant and Pamela Roberts, her daughter and the victim's mother, dated, and the defendant lived with them for several weeks. She stated that on Thursday, June 15, 2000, she did not observe any bruises on the victim. On the morning of June 16th, the mother drove her to work while the victim was still sleeping. After the mother drove the grandmother back to her residence that afternoon, the mother, the defendant, and the victim went to a movie, and the grandmother only observed the victim from a distance while he was sitting inside the vehicle. The grandmother was sleeping when they returned to the residence later that night.

The grandmother testified that on Saturday morning, June 17th, while the victim was eating breakfast, she observed bruises in the shape of a hand print on the left side of the victim's face. She further observed that the inside of the victim's ear was purple, and there were scratches and bruises on his neck. When the grandmother attempted to question the victim regarding the injuries, he refused to talk about them. The grandmother testified the mother attempted to "explain away" the injuries by telling her that while the victim was outside, he became tangled in the dog's leash and fell. The grandmother stated that had the victim fallen after being caught in the leash, his knees and hands would have been scratched from the gravel in the driveway. She then called the Department of Children's Services (DCS) regarding the bruises on the victim's neck and her suspicions that the defendant caused the injuries, but DCS did not respond.

The grandmother testified that on Tuesday, June 20th, while helping the victim in the bathroom, she discovered bruises on his buttocks. She stated that "his whole bottom was bruised, up his back a little bit, and down a little lower on his legs." The victim then told her that the defendant had spanked him with a black shelf taken from the entertainment center. The grandmother stated the victim also informed her that his neck injuries were caused by a dog leash, which the defendant had placed around his neck. The grandmother stated she had two similar "thick, nylon-type" leashes, which she used when walking her dog. She testified that after the victim informed her about the causes of his injuries, she again called DCS, and a case worker responded. She further stated that the victim never indicated that his mother caused the injuries; rather, he identified the defendant as the sole perpetrator.

The grandmother testified the victim had not seen the defendant since June 2000. She stated that in June 2000, the defendant wore earrings, had a shaved head, and dressed differently. His appearance had changed at the time of trial.

Detective Jana Buse Fadigan, who investigated the allegations, testified she spoke to the defendant over the telephone on June 26, 2000. The defendant informed her that he believed the victim's mother caused the injuries. He stated that while he was in the shower, the victim became tangled in a leash while playing outside and sustained injuries to his face and neck. The defendant testified that when the mother returned home and discovered what the victim had done, she spanked him twice on the buttocks with her hand and sent him to his room.

Detective Fadigan testified she later interviewed the defendant at the police station on July 10th. During this interview, the defendant stated he was left alone with the victim for approximately two hours while the mother ran errands. While he was taking a shower, he heard a "gagging" noise. The victim then ran into the bathroom and attempted to vomit into the toilet. The defendant then retrieved a wet rag for the victim and set him on the couch where he watched television until the mother returned. The defendant informed the mother what the victim had done and returned to the shower. The defendant stated that while he was in the shower, he heard the mother spank the victim twice with her hands and with a black board from the entertainment center. The defendant denied spanking the victim.

Detective Fadigan testified she interviewed the victim outside of the presence of his mother and his grandmother. The victim informed her that "Johnnie" had caused the injuries.

Dr. Christopher Greeley, a pediatrician, testified he reviewed photographs of the victim's injuries. He described the bruises on the victim's buttocks as "extensive" and "quite deep." Dr. Greeley opined these injuries were unlikely self-inflicted or accidental. He stated the bruises on the victim's buttocks were consistent with being struck repeatedly by a board. He further stated the victim likely experienced discomfort in sitting or walking until the injuries healed.

Dr. Greeley testified the victim's bruises, which spanned around his neck, were consistent with a leash being pulled around his neck. He opined that these injuries were unlikely self-inflicted or the result of an accident. Dr. Greeley stated the force of pulling an object around a person's neck could cause the person's carotid artery and windpipe to collapse, which could result in either brain damage or death. Dr. Greeley further opined that the bruising to the victim's ear was consistent with being hit on the side of the head, and such bruising was rarely accidental.

Deborah Pigman, the DCS case worker who investigated the allegations, testified she initially interviewed the victim outside the presence of his mother and grandmother. During the interview, the victim informed her that while he and the defendant were alone at the residence, the defendant spanked him for sticking his fingers down his throat, kicked him, and choked him with the dog's leash. Pigman stated that in subsequent interviews, the victim never indicated anyone other than the defendant caused the injuries.

-3-

Pigman testified she was present during the detective's interview with the defendant. She stated the detective informed the defendant that he was the primary suspect regarding the allegations and made him aware of the time frame in which the injuries occurred. Pigman testified the defendant never told them that he was out of town when the incidents occurred.

Pamela Roberts, the victim's mother, testified that on Friday, June 16th, she left the victim alone with the defendant for approximately two and one-half hours while she ran errands. When she returned to the residence between 1:00 and 2:00 p.m., she observed bruises on the victim's face and neck. The mother stated that when she questioned the victim in the defendant's presence, the victim stated he had gotten tangled in the dog's leash. The defendant gave the mother the same explanation regarding the cause of the victim's injuries. The mother stated she, the victim, and the defendant went to the movies shortly after she drove the grandmother home from work and returned to the residence while the grandmother was sleeping.

The mother testified she did not observe the bruises on the victim's buttocks until Sunday, June 18th, after the grandmother had observed them. She stated that after the victim spoke to the police, he told her that the defendant had caused the injuries to his neck, face, and buttocks.

The mother testified that on the morning of June 16th, she spanked the victim three to four times on his buttocks with her hand. She stated the victim whined but did not cry. She further stated she did not spank the victim hard enough to cause the bruises. The mother denied ever spanking the victim with the black shelf.

The mother testified that when she confronted the defendant with the allegations, he admitted he caused the injuries. However, he stated she should admit to causing the injuries because she would receive a lesser sentence.

The mother stated that in June 2000, the defendant wore earrings, shaved his head, and appeared different than he did at trial. She further stated the defendant was the only person the victim referred to as "Johnnie."

The defendant testified he dated the victim's mother for a few months and spent the night at her residence on several occasions. He stated he and the mother broke up on Easter in 2000. The defendant stated that although he often played with the victim, he did not spank or otherwise discipline him. He further stated he observed the mother spank the victim on several occasions using her hands, a belt, and a black board from the entertainment center.

The defendant testified that on Easter Sunday, April 23, 2000, he observed an injury to the victim's neck, which was similar to the bruises depicted in the photographs. He stated the incidents to which he referred during the interview with the detective occurred a few weeks prior to Easter. The defendant maintained that when the detective interviewed him, she never informed him that she was referring to the events which occurred on June 16, 2000.

The defendant testified that on Tuesday, June 13th, he traveled to Bowling Green, Kentucky, to visit his father, who was remodeling a Wal-Mart store. On Friday, June 16th, the defendant, his father, Tyson Hall, and two other employees ate lunch together. After running errands, the defendant left Bowling Green at approximately 4:00 p.m. and arrived at his residence between 6:00 and 6:30 p.m. The defendant testified that on Sunday, June 18th, his cousins were killed in a car accident.

Wayne Raymond Reeves, the defendant's father, testified that from May until July 2000, he was in Bowling Green, Kentucky, remodeling a Wal-Mart store. He stated the defendant visited him during the week prior to June 18th. On Friday, June 16th, Reeves, the defendant, and Tyson Hall, Reeves' supervisor, ate lunch together, and the defendant remained with Reeves until 3:00 or 4:00 p.m. Reeves stated he saw the defendant later that night at the Reeves residence in Tennessee. On June 18th, they discovered that two family members had been killed in a car accident.

Tyson Hall testified that while working at Bowling Green, he met the defendant and ate lunch with him and Reeves on a Friday. Although Hall could not recall the specific date, he stated that two days later on Sunday, Reeves informed him that he had a death in the family.

The jury convicted the defendant of two counts of aggravated child abuse of a child six years of age or less, Class A felonies. *See* Tenn. Code Ann. § 39-15-402(b). The trial court sentenced him as a violent offender to twenty years on each count to be served concurrently.

## I. SUFFICIENCY

The defendant contends the evidence was insufficient to support the convictions. We disagree.

## A. Standard of Review

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

**B. Analysis**

As applicable to the case at bar, a person commits aggravated child abuse, who "knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury," and the act is accomplished through the use of a "deadly weapon." Tenn. Code Ann. §§ 39-15-401(a), -402(a). If the abused child is six years old or less, the offense is a Class A felony. *Id.* § 39-15-402(b). A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5)(B).

The defendant was convicted of one count of aggravated child abuse through the use of a deadly weapon for hitting the victim repeatedly with a wooden board. The second count of aggravated child abuse through the use of a deadly weapon relates to the incident during which the defendant choked the victim with a dog leash.

The victim testified that while he and "Johnnie" were alone in the victim's residence, "Johnnie" placed a dog leash around his neck and repeatedly choked him causing bruises around his neck. The victim stated he felt as if "some blood was getting [sic] to . . . bust out." He testified that on the same day, "Johnnie" spanked him multiple times with a black board taken from the entertainment center. The victim stated he fell on the floor each time he was hit, and he had bruises on his buttocks as a result of the spankings. Our review of the photographs clearly reveals these bruises are certainly not normal injuries one would expect to see on a child. The photographs of the buttocks depict excessive discoloration that extends all the way across both buttocks.

The victim's mother and grandmother testified regarding the bruises they observed on the victim after he had been left alone with the defendant on June 16th. The victim's mother, his grandmother, the detective, and the DCS case worker stated the victim maintained that the defendant caused the injuries. The victim's mother stated the defendant confessed to the offenses and wanted her to take the blame. Dr. Greeley testified that the injuries were unlikely accidental or self-inflicted; that the injuries were consistent with the victim's explanation as to how they were caused; that the bruises on the victim's buttocks were extensive; and that the force of the choking could have caused the victim's windpipe or an artery to burst, resulting in brain damage or death. Further, the wooden board and the leash, due to the manner of their use, were capable of causing serious bodily injury. *See* Tenn. Code Ann. § 39-11-106(a)(5)(B). In viewing the evidence in a light most favorable to the state, we conclude the proof presented at trial was sufficient to support the defendant's convictions for aggravated child abuse.

The defendant contends the victim was not subjected to a meaningful examination at trial regarding his ability to distinguish between the truth and a lie. However, the defendant failed to object on this basis at trial. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. State v. Alder, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Regardless, the victim testified he knew the difference between the truth and a lie; that he would be punished for telling a lie; and that he would tell the truth while testifying. This argument is without merit.

The defendant next identifies various inconsistencies in the victim's testimony. However, these alleged inconsistencies involve the credibility of the witness, which is within the exclusive purview of the jury as the trier of fact. This argument is without merit.

The defendant argues that although Dr. Greeley was a qualified expert in the area of pediatrics, he was not qualified as an expert in the area of bruising and, therefore, testified beyond the scope of his expertise. However, the defendant failed to object on this basis at trial. Therefore, this argument is waived. *See* Alder, 71 S.W.3d at 302; Thompson, 36 S.W.3d at 108.

The defendant next claims that the jury's verdict was based upon speculation and inferences drawn from inferences. In support of this argument, the defendant notes his alibi defense. However, the defendant presented this alibi defense to the jury, who, as the exclusive trier of fact, rejected the defense and convicted the defendant of the charges. *See* Forbes v. State, 559 S.W.2d 318, 324 (Tenn. 1977). We are not at liberty to set aside this credibility determination.

Finally, the defendant contends the evidence was insufficient to establish the victim's age at the time the offenses occurred. We note that in discussing the elements of the offenses with the trial court prior to closing arguments, defense counsel conceded that the victim's age was not an issue. Regardless, the victim testified he was six years old at the time of trial and four or five years old when the offenses occurred. We conclude this evidence is sufficient to establish that the victim was six years old or less when the offenses occurred.

## II. PHOTOGRAPHS

The defendant contends the trial court erred in admitting certain photographs of the victim's injuries. We disagree.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See* State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* Notwithstanding, a photograph must be found relevant to an issue at trial with its probative value outweighing any prejudicial effect before it may be admitted into evidence. *See* State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998). Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Banks, 564 S.W.2d at 951.

Five photographs of the victim's injuries were admitted at trial. Two of the photographs illustrate the bruises on the victim's neck, while three of the photographs depict the bruises on his buttocks. We note that on appeal, the defendant fails to identify which photographs were erroneously admitted.

Prior to trial, the defendant filed a motion in limine seeking to limit the state to one photograph depicting the injuries to the victim's buttocks and one photograph depicting the injuries to his neck. In denying the motion, the trial court found that the photographs were not misleading or gruesome, and their probative value was not outweighed by the danger of unfair prejudice. In its order denying the defendant's motion for new trial, the trial court noted that each photograph illustrated a different portion of the victim's injuries, and the photographs were not cumulative.

During trial, the defendant objected to the admissibility of a photograph of the victim's spread buttocks. In overruling the objection, the trial court noted that the photograph depicted a different degree of the injury in that it showed more redness toward the inner portions of the buttocks than what was depicted in the other photographs. The trial court then found that the photograph was neither misleading nor unduly gruesome, and its probative value was not substantially outweighed by the danger of unfair prejudice. In its order denying the defendant's motion for new trial, the trial court noted that the photograph illustrated the nature and severity of the injuries and the amount of force required to inflict the injuries.

We agree with the trial court's findings. Each photograph is relevant to illustrate the nature and severity of the injuries and the amount of force required to inflict the injuries. *See* Tenn. R. Evid. 401. Moreover, Dr. Greeley testified the bruising illustrated in the photograph of the victim's spread buttocks indicated that "a much more significant force" was involved. Furthermore, the probative value of the photographs is not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. Therefore, we conclude the trial court did not abuse its discretion in admitting the photographs at trial.

Accordingly, we affirm the judgments of the trial court.

JOE G. RILEY, JUDGE