IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2002

**STATE OF TENNESSEE v. JOSEPH WILLIAM WILSON**

**Direct Appeal from the Circuit Court for Madison County**
**No. 00-439     Roger A. Page, Judge**

---

**No. W2001-03007-CCA-R3-CD  - Filed February 3, 2003**

---

A Madison County jury found the defendant guilty of three counts of aggravated rape and one count each of attempted second degree murder, especially aggravated robbery, especially aggravated burglary, conspiracy to commit aggravated burglary, and misdemeanor vandalism.  In this appeal, the defendant argues: (1) the evidence is insufficient to support his convictions; (2) certain photographs of the victim's injuries were improperly admitted; (3) evidence that the defendant committed a subsequent burglary was improperly admitted; and (4) the trial court erred in failing to charge the jury as to simple rape as a lesser-included offense of aggravated rape.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Daniel J. Taylor, Jackson, Tennessee, for the appellant, Joseph William Wilson.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

During the early morning hours of Saturday, November 27, 1999, the seventy-year-old victim awoke when intruders entered her home.  The victim identified the intruders as the defendant and Jason White.  She stated the defendant instructed her to get out of bed.  She said that when she complied, the defendant placed a knife to her throat and walked her down the hall into the den, where he asked her for money.  She testified that after the intruders took six dollars from her purse, the defendant took her into a bathroom and sat her on the commode.

The victim stated the intruders tied her hands behind her back with a towel.  She said the defendant placed his penis in her mouth and threatened to cut her throat if she did not perform

fellatio. The victim testified that when she did not perform to the defendant's satisfaction, he then threw her to the floor, removed her clothing, and inserted his penis into her vagina. Her vagina was torn and required stitches.

According to the victim, the defendant then pulled her off the floor and struck her head against a wall. The victim stated the defendant "rant[ed] and rav[ed]," and called her a "whore" and a "bitch." She testified the defendant again placed his penis back into her mouth, threatened to cut her throat if she did not perform fellatio, and kicked her. The victim testified she asked the defendant why he was doing this, and he replied, "Because you didn't have much money."

The victim stated that during the rapes, White kept telling the defendant, "We need to go." She said that when White had a question about the rifles in her gun cabinet, the defendant went out of the bathroom and gave instructions on which guns to take. She said the intruders asked her for her car keys, and she told them they were by the back door.

She testified that before the intruders left, the defendant cut her throat and said, "Now, bitch, I guess you'll call the police." She stated she felt blood gushing but lay still and pretended to be dead. After the intruders left, the victim fled to her daughter's nearby home, where her daughter and son-in-law obtained emergency assistance for her. The victim was transported to the hospital, where doctors performed surgery to repair the huge, gaping laceration to her throat and the laceration in her vagina. Miraculously, the victim survived.

According to the victim, the intruders took the cash from her purse, rifles, diamond rings and other jewelry, and her white 1991 Cadillac Seville. She testified they also broke the lock on her gun cabinet.

The victim stated she only saw two intruders, whom she identified as the defendant and White. She said that at one point, the defendant instructed White to guard the bathroom door while the defendant left the bathroom. She said the defendant also told White to "gather up stuff." She testified both the defendant and White were carrying knives, but that White never entered the bathroom and never touched her.

Jason White testified that on the night of the offense he, the defendant, Brandon Taylor, and Rodney Smith were riding in Taylor's car searching for a house to burglarize. White stated they chose to enter the victim's house because there was no car in the driveway. He said all of them except Taylor, who was driving, exited the car and approached the victim's house. White indicated Taylor was to drive up and down the road and wait on them, but instead left. White testified that he, the defendant, and Smith entered the victim's home after Smith kicked in the front door. White stated that he and Smith exited the house immediately after they heard the victim ask, "Who are you?"

According to White, when he and Smith went outside, Taylor's car was gone. White said he and Smith were standing in front of the house when the victim stepped outside, and the defendant pulled her into the house. White testified he and Smith reentered the house after the defendant told them to come in and "get everything." White said the defendant sat the victim on the commode in

the bathroom and told White to stay with her while he found something to bind her. White stated he remained outside the bathroom. White testified the defendant returned with something that appeared to be a white scarf and used it to tie the victim.

White stated he then went into a bedroom, where he took some jewelry and then went into the hall, where he and Smith took several guns. White said he and Smith told the defendant it was time to leave. White testified that while the defendant was in the bathroom, he heard the victim say, "Please don't do this," and "What do you want?" White stated that the defendant cursed the victim and used a loud, mean tone of voice. According to White, the defendant asked him if he "wanted some," apparently inquiring if White wanted to have sex with the victim; White said he refused and indicated they should leave. White testified the defendant said, "Well, I'm going to cut this bitch's throat." White stated he again encouraged the defendant to leave. White said he and Smith went outside, and the defendant exited behind them.

White testified they found a white Cadillac in the garage, and he and the defendant reentered the house to find the keys. White said the defendant walked down the hall, kicked the victim, and yelled, "Bitch, where are your f__king keys at?" White testified the defendant then told him the car keys were by the back door. White stated that after he found the keys, he walked down the hall and saw the victim on the floor with her head tilted back and blood on her throat. According to White, after they exited the house, the defendant told him he cut the phone lines so the victim would not call the police.

White said he, the defendant, and Smith left in the Cadillac. White testified he saw a knife blade in the defendant's hand as they drove off; he described the blade as "squiggly" and "then straight at the end." White admitted he also had a knife, but stated he did not use it on the victim. White said they then met Taylor, who accompanied them to an unoccupied house where the defendant used the knife to cut a window screen. White testified that they entered the house through the window, took money, and left.

Brandon Taylor testified that he was in his car with the defendant, White, and Rodney Smith when they chose the victim's house as a target for a burglary. Taylor stated he pulled into the driveway, the others exited the car, and he left.

Rodney Smith testified Taylor drove him, the defendant, and White to the victim's home where all of them except Taylor exited the vehicle with the intent of breaking into the house and stealing property. According to Smith, they planned for Taylor to drive up and down the road and wait for them to return to the car. Smith stated he saw the defendant carrying a knife as they approached the house. Smith stated he, the defendant, and White entered the house. Smith said he broke into a gun case and was gathering rifles when he heard the victim ask, "Who's there?" Smith testified he then ran out of the house and into the front yard while carrying the rifles.

Smith stated he was crouched down near bushes in front of the house when the victim walked out of a door, and then someone escorted her back inside. Smith testified he briefly reentered the house; told the defendant and White, "Come on, let's go;" and exited. Smith said White promptly joined him and, while they were waiting on the defendant, they found the victim's

white Cadillac in a garage behind the house. Smith testified he and White told the defendant to ask the victim for her car keys, and a few seconds later, the defendant instructed them the keys were by the back door. Smith stated that while he was in the house, he heard the defendant say to the victim, "Where's the f__king money at, bitch, or I'll kill you." Smith testified he heard the victim ask, "Why are you doing this?" while she was in the bathroom. Smith stated he did not enter the bathroom. He said that he and White returned to the victim's car with the keys and waited for the defendant.

Smith said he, the defendant, and White left in the Cadillac. Then they picked up Taylor at his grandmother's home, and the four of them went to another house where the defendant used a knife to cut a window screen, which allowed them to enter the house.

Albert Jackson testified his home was burglarized on November 27, 1999, while he was at work; when he returned home, he noticed a window screen was cut and a window was broken. Deputy David Ward of the Madison County Sheriff's Department found a knife on the ground under the broken window. Ward stated the knife blade was stained with blood. He described the blade as having "indentations" and being "serrated."

Margaret Bash, a forensic scientist with the TBI crime lab, testified that DNA testing showed the blood on the knife belonged to the victim. Bash further testified that no blood was found on the defendant's coat, and tests failed to reveal the presence of semen on vaginal and oral swabs taken from the victim.

The defendant, who was sixteen at the time of the offense, testified he was not at the victim's home and did not commit the offenses. He described in detail his activities of the day and night. According to the defendant, he spent the evening with Ande Braddock, Lee Coley, Patricia Coley, Guy Goodman, and Danny Wilson at Wilson's house, where they all remained until the following morning.

Lt. Donna Turner testified the defendant told her he was in a car with Ande Braddock, David Price, and a man named Chuck at the time of the offense. She also stated the defendant laughed when she showed him a photograph of the victim's injuries. The defendant testified that when he gave the statement to Lt. Turner, he was mistaken about the date when he was in a car with Ande Braddock and David Price. He also denied laughing when Lt. Turner showed him a photograph of the victim.

Ande Braddock testified the defendant was with him from November 25 through November 28, 1999. According to Braddock, he and the defendant picked up Lee Coley and went to Danny Wilson's house where he and the defendant spent the night with Wilson, Lee Coley, Patricia Coley, and Guy Goodman, and they fell asleep watching movies sometime between midnight and 5:00 a.m. Braddock stated that Guy Goodman awoke them the following morning.

Vicki Braddock, Ande Braddock's mother, testified the defendant was with her son during the Thanksgiving weekend. She stated that on Friday, November 26, 1999, shortly before dusk, Ande Braddock and the defendant were at her home when they left to give a neighbor a ride home.

-4-

She stated they returned a short time later. She said she also saw the defendant with her son the following afternoon. Robert Eguires testified he saw the defendant and Ande Braddock at a bar sometime between 5 p.m and 7 p.m. on Friday, November 26th. The defendant also presented the testimony of Lee Coley, Danny Wilson,[1] Patricia Coley, and Guy Goodman corroborating that the defendant and Ande Braddock were with them at Danny Wilson's home at the time the offenses were committed. David Price testified he, Ande Braddock, and the defendant rode together in a car on Thanksgiving night.

April Kennon testified that in the early morning hours of Saturday, November 27, 1999, Jason White came to the hotel room she shared with her then boyfriend and current husband, Chris Kennon. She stated White arrived with some other individuals in a white Cadillac. She testified White had a knife with blood on it, that he said he cut a lady's throat twice because she did not have much money, and he thought the lady was dead. She stated White gave her some jewelry. She acknowledged that she had given a prior statement to law enforcement in which she said the defendant was in the white Cadillac.

The defendant also presented proof that none of the fingerprints lifted from the victim's gun cabinet or car matched the defendant's fingerprints, and that tests failed to reveal any fiber transfers between the defendant's and the victim's clothing or other items.

The jury found the defendant guilty of attempt to commit second degree murder, a lesser-included offense of attempt to commit first degree murder; three counts of aggravated rape; especially aggravated robbery; especially aggravated burglary; conspiracy to commit aggravated burglary; and misdemeanor vandalism. The trial court sentenced the defendant to an effective sentence of seventy-one years.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant argues the evidence presented at trial was insufficient to support the jury's finding that he was the person who committed the crimes because there was a lack of physical evidence, the testimony of his co-perpetrators lacked credibility, the victim's identification testimony was unreliable, and the defendant presented alibi witnesses.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to

---

[1]Danny Wilson died prior to trial. His prior testimony was read into the record.

the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the victim identified the defendant as the armed intruder who raped her three times, cut her throat, and participated in the theft of her property. Jason White, Rodney Smith, and Brandon Taylor all testified the defendant went with them to the victim's house. White and Smith testified the defendant entered the house with them. Smith testified he overheard the defendant curse loudly at the victim and threaten to kill her. White testified the defendant asked him if he "wanted some," said he was going to cut the victim's throat, and cursed and kicked the victim. White further testified that he saw blood on the victim's throat after the defendant reentered the bathroom with the victim. Viewing the evidence in a light most favorable to the state, this evidence was sufficient to support the defendant's identification as the perpetrator of these offenses.

## A. Physical Evidence

The defendant contends there is no physical evidence to establish his identity as the perpetrator. Physical evidence is not a prerequisite to a conviction. *See generally,* State v. Eddie Lee Taylor, No. W2001-01077-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 307, at **5-9 (Tenn. Crim. App. Apr. 4, 2002, at Jackson) (holding identification testimony was sufficient to support the conviction, despite the lack of physical evidence). The state was not required to establish the defendant's identity as the perpetrator through scientific testing or other physical evidence.

## B. Accomplice Testimony

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The testimony of Jason White, Rodney Smith, and Brandon Taylor was corroborated by the testimony of the victim, who identified the defendant as the perpetrator. While the defendant argues that the testimony of the other participants in the crime lacked credibility due to numerous factors, including prior untruthful statements about the offenses and motivation to receive favorable treatment through plea agreements, these matters were presented to the jury. It is the jury, not this court, which determines and weighs the credibility of witnesses. *See* State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

## C. Victim's Testimony

The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999); *see* State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). Any inconsistency, inaccuracy, and omissions in a witness's testimony may be considered by the jury in determining the weight to attribute to the testimony, but a jury verdict will not be disturbed unless the inaccuracies or inconsistencies in the

witness's testimony are "so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt." Radley, 29 S.W.3d at 537.

In the instant case, the victim testified she observed both the defendant and Jason White in her home on the night of the offenses; she indicated she was able to distinguish between them. She stated she saw the defendant's face while he was with her in the bathroom, and the lamps in the bathroom and across the hall provided her with adequate light in which to view the defendant. Jason White also testified there was a lamp in the bathroom, as well as nightlights in the house. The defendant argues that the victim's testimony was unreliable because she was on medication, wore glasses, and was never shown a photo lineup. He further contends her trial testimony was inconsistent with her prior testimony regarding her ability to identify her assailant and her initial statement to police, in which she could not recall what the perpetrator was wearing or whether he had facial hair.

The defendant presented these matters to the jury during his cross-examination of the victim. While the jury was entitled to consider them, they are not cause to disturb the jury's verdict. The proof at trial established that the victim observed the defendant under such circumstances as would permit her to make a proper identification.

## D. Alibi Witnesses

The defendant points to the number of witnesses who testified that the defendant was at Danny Wilson's home at the time of the offenses. However, this court's review is limited to whether a rational trier of fact could have found him guilty of the charges beyond a reasonable doubt. State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). We are not required to find the state's proof was uncontroverted or perfect in order to sustain the conviction. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). It is clear the jury rejected the testimony of the defendant and his alibi witnesses. The credibility of alibi witnesses and the weight to give their testimony rests solely within the province of the jury. Forbes v. State, 559 S.W.2d 318, 324 (Tenn. 1977). This court is without authority to disturb a jury's verdict merely because the jury accredited the testimony of the state's witnesses rather than the defendant's witnesses.

In summary, the arguments presented by the defendant go to the weight and credibility of the state's evidence rather than its sufficiency. We conclude the evidence presented at trial was sufficient to support the defendant's convictions. This issue is without merit.

## II. ADMISSIBILITY OF PHOTOGRAPHS

The defendant contends that photographs showing the open wound to the victim's throat prior to her surgery and the stitches on her throat following her surgery were inadmissible under Rule 403 of the Tennessee Rules of Evidence. We disagree.

Otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403. The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, photographs must be relevant to an issue at trial with their probative value outweighing any prejudicial effect that they may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

The trial court ruled that some photographs sought to be admitted by the state were inadmissible. However, as to the challenged photographs, the trial court found them "not particularly gruesome" and relevant to certain charged offenses.

We must first determine whether the photographs were relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In the instant case, the defendant was charged with numerous offenses, including attempt to commit first degree murder, especially aggravated robbery, and especially aggravated burglary.

The photographs of the victim's injuries, taken both before and after her surgery, showed the nature and extent of the injury to the victim's throat, including the fact that her throat had been slashed twice. They were relevant to the issues of the defendant's intent and premeditation in cutting the victim's throat, an element of the charged offense of attempted first degree murder.[2] *See* Tenn. Code Ann. §§ 39-12-101(a)(3), -13-202(a)(1). Further, the photographs were relevant to the issue of whether the victim suffered serious bodily injury, an element of the charged offenses of especially aggravated robbery and especially aggravated burglary. *See id.* §§ 39-13-403(a)(2), -14-404(a)(2).

Further, we conclude the probative value of the photographs outweighs any prejudicial effect they may have had. While the photographs are somewhat graphic, they are not overly provocative or gruesome, as asserted by the defendant. Thus, we conclude the trial court did not abuse its discretion in admitting them into evidence.

### III. EVIDENCE REGARDING SUBSEQUENT BURGLARY

The state presented the testimony of Rodney Smith and Jason White, who testified that after they left the victim's house, they and the defendant committed another burglary in which the defendant used a knife to cut a window screen. The state presented further proof that a knife stained with the victim's blood was found beneath a window at the scene of this burglary. The defendant maintains evidence of the subsequent burglary should have been excluded under Tennessee Rule

---

[2]The jury convicted the defendant of the lesser-included offense of attempt to commit second degree murder.

of Evidence 404(b), which provides that evidence of other crimes is not admissible to prove the character of a person in order to show action in conformity with the character trait.

Generally, Rule 404(b) is one of exclusion, but there are exceptions. State v. Jones, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999). The generally recognized exceptions to the rule allow evidence offered to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). The trial court should conduct a jury-out hearing in which it determines: (1) if a material issue other than character forms the basis for relevancy; (2) if the danger of unfair prejudice outweighs the probative value; and (3) if there is "clear and convincing" evidence the defendant committed the other crime. Tenn. R. Evid. 404, Advisory Commission Comments; *see also* State v. James, 81 S.W.3d 751, 758 (Tenn. 2002). In the instant case, the trial court conducted a pretrial hearing on the admissibility of the evidence and found there was clear and convincing evidence the defendant participated in the subsequent crime; the defendant's identity was a material issue in the instant case; and the evidence showing the victim's blood on the knife found at the scene of the subsequent burglary was "crucial." The trial court concluded the danger of unfair prejudice did not outweigh the probative value of the evidence and held the evidence was admissible.

When a trial court substantially follows the procedures set forth in Rule 404(b), its decision will be given great deference by the appellate courts and will be reversed only where there is an abuse of discretion. James, 81 S.W.3d at 760. We conclude that the trial court properly complied with the requirements of Rule 404(b) in conducting the pretrial hearing and in making its determinations. Further, after a thorough review of the record, we conclude the trial court did not abuse its discretion when it held the evidence was relevant to the issue of identity and was, therefore, admissible.

## IV. LESSER-INCLUDED OFFENSE

The defendant's final contention is that the trial court erred in failing to instruct the jury on rape as a lesser-included offense of aggravated rape. The record reveals the trial court did not charge the jury as to any lesser-included offenses of aggravated rape because it felt there was no evidence to support convictions on lesser-included offenses.

### A. Standard of Review

The trial court has a duty to instruct the jury on any lesser-included offenses of the charged offense when such instruction is supported by the evidence. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001). The standard for an appellate court's review of the trial court's charge to the jury regarding lesser-included offenses is *de novo* with no presumption of correctness. State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002).

If an offense is found to be a lesser-included offense, the court must next ascertain whether the evidence justifies a jury instruction on the lesser-included offense. Bowles, 52 S.W.3d at 75. To do so, the court must first determine whether there is evidence that "reasonable minds" could

accept to establish the lesser-included offense. State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999). The court must view the evidence liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001). Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469.

The evidence, not the theories of the parties, determines whether an instruction on a lesser-included offense should be given. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." *Id*. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense. Burns, 6 S.W.3d at 472.

## B. Analysis

The state concedes that rape should have been charged as a lesser-included offense of aggravated rape. *See* Bowles, 52 S.W.3d at 78. The elements of aggravated rape as charged in the instant indictment include:

(1) unlawful sexual penetration;
(2) accomplished by force or coercion; and
(3) the defendant is armed with a weapon.

*See* Tenn. Code Ann. § 39-13-502(a)(1).

One statutory definition of rape is unlawful sexual penetration accomplished by force or coercion. *Id*. § 39-13-503(a)(1). Since these statutory elements are included within the statutory elements of the charged offense of aggravated rape, rape is a lesser-included offense of aggravated rape under part (a) of the Burns analysis. *See* Burns, 6 S.W.3d at 466. Where an offense is determined to be a lesser offense under part (a) of the Burns test, evidence sufficient to warrant an instruction on a greater offense will also support an instruction on the lesser offense. State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002). Therefore, the trial court erred in failing to instruct the jury on rape as a lesser-included offense of aggravated rape.

## C. Harmless Error

We must next determine whether this error was harmless. Harmless error relating to the failure to charge lesser-included offenses must be shown "beyond a reasonable doubt." Ely, 48 S.W.3d at 727. The proper inquiry is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 191. In making the harmless error determination, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *Id*. The question "hinges upon what a reasonable jury would have done in light of the evidence produced at trial." Richmond, 90 S.W.3d at 663 (emphasis in original).

-10-

Our review of the record shows the state's uncontested proof was that the victim was raped by a knife-wielding assailant who slashed her throat. The identity of the perpetrator was the only issue at trial. Based on the proof in the record, no reasonable jury <u>would</u> have convicted the defendant of rape rather than aggravated rape. Therefore, we conclude the trial court's error was harmless beyond a reasonable doubt.[3]

## CONCLUSION

In summary, we conclude there was sufficient evidence of the defendant's identity as the perpetrator to support his convictions. The trial court did not err in admitting into evidence photographs of the victim's injuries and testimony concerning the subsequent burglary. Further, we determine that while the trial court erred in failing to instruct the jury on rape as a lesser-included offense of aggravated rape, the error was harmless beyond a reasonable doubt. Accordingly, we affirm the judgments of the trial court.

_____
JOE G. RILEY, JUDGE

---

[3]The defendant does not contest the failure to charge other potential lesser-included offenses of aggravated rape. Regardless, any possible error would be harmless beyond a reasonable doubt.