# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE 1999 SESSION



FILED

March 9, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE**, | * | C.C.A. NO. W1998-00637-CCA-R3-CD |
| Appellee, | * | SHELBY COUNTY |
| v. | * | Hon. W. Fred Axley, Judge |
| **KHANH V. LE**, | * | (First Degree Murder) |
| Appellant. | * | |

For Appellant:

W. Mark Ward
Asst. Shelby County Public Defender
Suite 2-01, 201 Poplar Ave.
Memphis, TN 38103

Robert W. Jones
Asst. Shelby County Public Defender
Criminal Justice Center - 2nd Floor
Memphis, TN 38103

For Appellee:

Paul G. Summers
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN 37243-0493

Peter M. Coughlan
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

Edgar A. Peterson, IV
Assistant District Attorney General
Criminal Justice Center - Third Floor
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED

NORMA MCGEE OGLE, JUDGE

**OPINION**

On November 10, 1997, the appellant, Khanh V. Le, was convicted by a jury in the Shelby County Criminal Court of first degree murder. The trial court sentenced the appellant to life imprisonment in the Tennessee Department of Correction.

In this appeal as of right, the appellant presents the following issues for our review:

(I) Whether the evidence is sufficient to sustain the appellant's conviction of first degree murder;

(II) Whether the trial court erred by refusing to charge any lesser included offenses to first degree murder;

(III) Whether the trial court erred by denying the appellant's motion to suppress identification testimony.

Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**I. Factual Background**

The appellant's conviction resulted from the shooting death of Steve Richardson near the intersection of Court and Watkins Streets in Memphis during the early morning hours of July 4, 1995. The evidence at trial established that at approximately 1:00 a.m. on July 4, 1995, Sarah Simmons, her sister, Nellie Sue Ayers, her nephew, Benjamin Marshall, and several other friends were on the porch of Simmons' apartment at 1413 Court Street.

Simmons testified on behalf of the State that she had left the porch and gone into the apartment when she heard a "screeching noise" followed by

2

shouting and yelling. When Simmons looked out the window, she saw a black man, known to her as Maurice, arguing with an "Asian" man. Two other Asian men joined in the argument and Maurice hit one of them in the back with a beer bottle. Maurice then jumped into the back of a pick-up truck and "sped" down the street. As the truck circled back and passed 1377 Court, the three Asians, who had been joined by several other Asians, began throwing bricks, bottles, and sticks at the truck. According to Simmons, "After that everything cooled down."

A few minutes later, as Simmons prepared to barbecue, she heard a commotion down the street. When she looked up, she saw Steve Richardson walking up the middle of Court Street. She had previously met Richardson at a soup kitchen where she volunteered and he had been to her home several times. As Richardson approached Simmons' apartment, a group of five Asian men walked up behind him, and one of the men struck Richardson in the back with a large stick. When Richardson responded "What's happening, what's wrong?" the men surrounded Richardson. Simmons, Nellie Sue Ayers, Benjamin Marshall, and three other individuals got off the porch and ran toward Richardson. When Simmons was approximately four to five feet from Richardson, she saw an Asian man standing on a hill a short distance away. The man calmly walked off the hill and fired three shots, two of which struck Richardson. As Richardson was lying on the ground, the man walked across the street, stood over him, and fired at least one more shot at Richardson, again striking Richardson. The shooter then turned and calmly walked away. Simmons testified that she was five to six feet away from the shooter, and had no trouble seeing him. She further stated that the shooter "had anger in his face." Additionally, Simmons testified that it would have been impossible to confuse Maurice and Richardson because of their size difference.

3

Benjamin Marshall, Simmons' thirteen-year old nephew, testified that he was among the group sitting on the porch of Simmons' apartment in the early morning hours of July 4, 1995. Marshall had gone to bed, but was awakened by the sound of "hollering" outside the apartment. When he went outside, he saw Maurice involved in an argument with an Asian man. Maurice then jumped into the back of a pick-up truck which left the neighborhood. As the truck was leaving the neighborhood, Marshall saw a group of Asian men throw bricks and other objects at the truck.

A few minutes later, Marshall saw Steve Richardson walking up the street. Richardson approached a group of Asian men and asked "What's going on?" One of the men then struck Richardson across the back with a stick and the men began wrestling with Richardson. Marshall then saw a man come from a small hill and shoot Richardson three or four times. After Richardson fell to the ground, the man walked over to him, shot him again and then walked away.

Marshall testified that he had seen the man with the gun on three prior occasions. Approximately one and one-half weeks before the shooting, he and the man had helped a neighbor move furniture. Additionally, Marshall had seen the man in a Vietnamese grocery store and in a Pic and Pay store. Further, Marshall identified the appellant as the shooter.

On July 7, 1995, Simmons and Marshall were taken to the police station to view a photographic lineup. They were seated at opposite ends of the room and asked to review a group of photographs in an effort to identify the shooter. Simmons quickly identified a photograph of the appellant as the shooter. As Simmons stood to leave the room to go into the restroom, Marshall also identified a

photograph of the appellant. Marshall testified that he was not influenced by his aunt or the police to select a certain suspect.

Officer Charles Moore, an officer with the Memphis Police Department, testified that at approximately 2:23 a.m. on July 4, 1995, he received a report of a shooting at the intersection of Court and Watkins Streets. When he arrived, he observed a black male lying on the street. The victim was bleeding and unresponsive. Moore talked with witnesses at the scene who stated, "He was the wrong one . . . he didn't have nothing to do with it. They shot him for nothing." The witnesses also stated that the suspects were Asian men, possibly Vietnamese, who had fled the scene after the shooting. Moore searched the area around the scene of the shooting and did not find any shell casings or weapons.

Gene Couglin, a paramedic with the Memphis Fire Department, arrived at the intersection of Court and Watkins Streets at 2:23 a.m. on July 4, 1995. Couglin discovered a black male in extremely critical condition lying on the street with two apparent gunshot wounds. One wound was above the left ear and another wound was to the left flank. The victim was unresponsive. Moreover, the victim's heart rate and respiration indicated that he was in shock. The victim was transported to The Med, a hospital in mid-town Memphis.

Dr. Joe Patton, a trauma surgeon with the University of Tennessee, was working at The Med in the early morning hours of July 4, 1995. Dr. Patton recalled that the victim, later identified as Steve Richardson, arrived in the emergency room with three bullet wounds. One bullet had penetrated his aorta near his diaphragm and because of the location of the wound, Dr. Patton had difficulty controlling the bleeding. Dr. Patton further testified that because of Richardson's

5

loss of blood, there was not sufficient blood in his vascular system, particularly his heart, to maintain normal bodily function. Dr. Patton noted that the other two bullet wounds were to the left side of the face and the left buttock. Richardson died at 5:10 a.m.

Dr. Wendy Gunther, an Assistant Medical Examiner for Shelby County and licensed forensic pathologist, examined the body of the victim. The examination revealed gunshot wounds to the cheek, torso, and buttocks. The victim also had an abrasion on his back and elbow that was caused by either scraping the skin or a blunt object striking the skin. Dr. Gunther concluded that the victim died as a result of the gunshot wound to the torso.

Eugene M. Cole, an investigator for the Public Defender's Office, testified on behalf of the appellant. Cole investigated the scene of the crime and photographed the intersection of Court and Watkins Streets. He determined that the distance from the front porch of the residence at 1413 Court Street to the intersection was eighty feet and eight inches.

Additionally, Dion Gonzales Shell testified on behalf of the appellant that on July 4, 1995 , he resided at 1413 Court Street and was among the individuals on Simmons' porch in the early morning hours of July 4. Shell also observed the confrontation between Richardson and the group of Asian men. As he was walking into the house, he heard gunshots and someone said, "They shot Steve." Shell further testified that because the area was dark he was unable to see the Asian men who attacked Richardson or the shooter. He also assumed that the streetlight was out. During cross-examination, Shell admitted that during the evening of the shooting, he had consumed the equivalent of nine to twelve beers,

6

but maintained that he was not intoxicated. Shell also stated that he did not recall whether the streetlight at the intersection was working properly. At the end of the cross-examination, Shell explained, "I didn't see nothing . . . I don't know nothing."

## II. Analysis

**Sufficiency of the Evidence**

**I. Identity**

The appellant contends that the evidence is not sufficient to sustain his conviction of first degree murder. Specifically, the appellant argues that there was insufficient evidence of his identity as the shooter.

In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that "no reasonable trier of fact" could have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn.

1990).

Moreover, it is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a factual issue to be determined by the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)); see also State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Indeed, this court has held that the testimony of a witness identifying the perpetrator is sufficient in and of itself to support a conviction. Strickland, 885 S.W.2d at 87-88; see also State v. Radley, No. 01C01-9803-CR-00113, 1999 WL 510515, at *4 (Tenn. Crim. App. at Nashville, July 15, 1999); State v. Faulkens, No. 02C01-9809-CR-00283, 1999 WL 314766, at *3 (Tenn. Crim. App. at Jackson, May 20, 1999).

The appellant argues that the eyewitness identification of the appellant is not reliable because of the conditions surrounding the shooting. However, the State established that both Simmons and Marshall unequivocally identified the appellant as the person who shot the victim. The record reflects that Simmons was standing five to six feet from the appellant and Marshall was standing approximately thirty feet from the appellant when he shot the victim. Moreover, Simmons and Marshall testified that they had seen the appellant in the neighborhood several times prior to the shooting. More specifically, Marshall testified that he was in the presence of the appellant for about thirty minutes approximately one week prior to the shooting. Simmons also testified that the intersection where the shooting occurred was well-lighted and she had no trouble seeing the appellant's face. She further stated that she was able to see anger in the appellant's face. Likewise, Marshall stated that he "got a good look at his face." In light of the trial court's complete instructions to the jury concerning identification testimony, it was the

8

prerogative of the jury to accredit Simmons' and Marshall's identification of the appellant. This issue is without merit.

## II. Mens Rea

The appellant also argues that there was insufficient evidence of the mens rea required for a conviction of first degree murder. The appellant further contends that even if the appellant's identity as the shooter is established by the evidence, the proof shows that the killing was nothing more than second degree murder.

With respect to the appellant's conviction of first degree murder, the applicable statute provides that first degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1995). The first degree murder statute defines premeditation as

> an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (Supp. 1995). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1991); see also Tenn. Code Ann. § 39-11-106(a)(18) (Supp. 1995).

The element of premeditation is a question of fact for the jury and "may be established by proof of the circumstances surrounding the killing." State v.

9

Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992)); see also State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has identified several factors tending to demonstrate the existence of premeditation, including: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the appellant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42, and State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)); Pike, 978 S.W.2d at 914-15.

Furthermore, repeated shots or blows cannot alone establish premeditation but are properly considered along with other circumstances in assessing the existence of premeditation. Brown, 836 S.W.2d at 542. Other circumstances from which premeditation may be inferred include lack of provocation, the appellant's attempt to shoot the victim again after he had been felled by the first shot and rendered helpless, and the appellant's conduct and demeanor before and after the homicide. State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Additionally, premeditation may be inferred from the appellant's failure to render aid to the victim. State v. Fugate, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988).

Once the State establishes a homicide, it is presumed to be second degree murder. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1997); Brown, 836 S.W.2d at 543. The State bears the burden of establishing premeditation in order to elevate the crime to first degree murder. See West, 844 S.W.2d at 147; Brown, 836 S.W.2d at 543.

10

Upon review of the facts in the light most favorable to the State, we conclude that the evidence sufficiently supports the appellant's conviction of premeditated and intentional murder. Witnesses for the State testified that a group of Asian men fought with a black man named Maurice before the murder of Richardson. The record reflects that the appellant was not involved in the fight with Maurice. Richardson, a man dissimilar in appearance to Maurice, happened to walk up the street toward the intersection of Court and Watkins Streets several minutes later and was immediately targeted. As the victim wrestled with an Asian man who attacked him with a stick, the appellant walked toward the intersection from a hill across the street. The appellant was armed with a pistol and walked within a few feet of the unarmed victim. During the entire episode, the appellant fired a total of four shots in the direction of the victim, with three shots striking the victim's body. First, the appellant shot the victim in the torso. According to medical testimony, this shot to the torso proved to be fatal. Witnesses for the State testified that when the victim fell to the ground, the appellant walked closer to the victim, stood over him, and fired at least one more shot at the victim. The appellant then calmly left the scene of the shooting as the other Asian men began kicking and hitting the body of the victim. Medical evidence proved that the victim was shot in the torso, the face, and the buttocks. Accordingly, we conclude that the evidence is legally sufficient to support the appellant's conviction of first degree premeditated murder beyond a reasonable doubt. This issue is without merit.

**Jury Instructions - Lesser Included Offenses**

The appellant contends that the trial court erred by refusing to grant his request to instruct the jury on the lesser included offenses of second degree murder and voluntary manslaughter. The trial judge has a duty to charge the jury as to all the law of each offense included in the indictment, even absent a request by

the defendant. State v. Cleveland, 959 S.W.2d 548, 553 (Tenn. 1997); Tenn. Code

Ann. § 40-18-110(a) (1997). Moreover, a defendant has a right to have every issue

of fact raised by the evidence and material to his or her defense submitted to the

jury on proper instructions. State v. Robinette, No. 03C01-9611-CR-00430, 1997

WL 671889, at * 3 (Tenn. Crim. App. at Knoxville, October 29, 1997). Thus, a

defendant has a right to a jury instruction on all lesser included offenses of the

charged offenses if "the evidence introduced at trial is legally sufficient to support a

conviction for the lesser offense." State v. Langford, 994 S.W.2d 126, 128 (Tenn.

1998) (citing State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998)); see also State v.

Cutshaw, 967 S.W.2d 332, 341-342 (Tenn. Crim. App. 1997); Tenn. Code Ann. §

40-18-110 (1997); Tenn. R. Crim. P. 31(c).

> In State v. Cleveland, 959 S.W.2d 548, our supreme court stated:
>
> [T]he trial court must instruct the jury on all lesser grades
> or classes of offenses and all lesser included offenses if
> the evidence will support a conviction for the offenses.
> The instructions preserve a defendant's right to fair and
> reasonable notice of charges and allow the jury to
> consider all relevant offenses in determining the
> appropriate offense for conviction. Finally, "allowing
> consideration of the lesser included offenses and the
> offenses of lesser grades and classes, if the evidence
> supports guilt on those offenses, more evenly balances
> the rights of the defense and the prosecution and serves
> the interests of justice."

Id. at 553 (citation omitted).

In State v. Bolden, 979 S.W.2d 587, the appellant had been tried for

the offense of premeditated first degree murder. Over the appellant's objection, the

trial court charged the jury concerning the lesser included offense of second degree

murder. The jury convicted the appellant of second degree murder. On appeal the

appellant argued that the trial court erred by allowing the jury to consider second

12

degree murder as an option. In affirming the appellant's conviction for second degree murder, our supreme court stated:

> This court has interpreted Tenn. Code Ann. § 40-18-110(a) to mean that a trial court must instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense. . . .
>
> We have frequently held that the trial court's obligation under this statue is mandatory, provided there is a sufficient evidence for a rational trier of fact to find a defendant guilty of a lesser offense. . . .
>
> One purpose of the statue is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment. Although it often benefits the defendant to have a jury consider lesser offenses, the mandatory nature of the statute indicates that it facilitates the overall truth-seeking function of the process. . . .
>
> In view of the foregoing, the only remaining argument and the only question for review is whether the evidence was sufficient to sustain a conviction for the lesser included offense of second degree murder.

Id. at 593 (citations omitted).


Our supreme court recently stated that whether a lesser included offense must be charged in a jury instruction is a two-part inquiry. State v. Burns, No. 02S01-9806-CC-00058, 1999 WL 1006315, at *12 (Tenn., at Jackson, November 8, 1999) (publication pending). First, the trial court must determine whether a particular lesser offense is included in the greater charged offense. Id. If the trial court concludes that a lesser offense is included in the charged offense, the trial court must determine whether the evidence justifies a jury instruction on such lesser offense. Id.


The jury charge should be applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). The instruction is not required if

13

there is no proof in the record to support a conviction for the lesser offense. <u>State v. Howard</u>, 926 S.W.2d 579, 586 (Tenn. Crim. App. 1996). In addition, before a trial court is required to instruct the jury on a lesser included offense, there must be evidence in the record to support a conviction for the lesser offense. <u>State v. Stephenson</u>, 878 S.W.2d 530, 549-50 (Tenn. 1994); <u>State v. Boyd</u>, 797 S.W.2d 589, 593 (Tenn. 1990); <u>State v. Mellons</u>, 557 S.W.2d 497 499 (Tenn. 1977). Furthermore, our supreme court adopted a two-step analysis for determining whether a lesser included offense instruction should be given once the trial court concludes that a lesser offense is included in the charged offense. <u>Burns</u>, No. 02S01-9806-CC-00058, 1999 WL 1006315, at *14. First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser included offense. <u>Id.</u> In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgments on the credibility of such evidence. <u>Id.</u> Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense. <u>Id.</u>

> In this case, the indictment charged:
>
> Khanh V. Le on July 4, 1995, in Shelby County, Tennessee . . . did unlawfully, intentionally, deliberately and with premeditation kill Steve Richardson, in violation of T.C.A. 39-13-202, against the peace and dignity of the State of Tennessee.[1]
>
> Second degree murder is a "knowing killing of another." Tenn. Code

Ann. § 39-13-210 (Supp. 1995). The applicable statute states:

> 'Knowing' refers to a person who acts knowingly with respect to the conduct or to the circumstances

---

[1]As a result of the 1995 amendment to Tenn. Code Ann. § 39-13-202 effective July 1, 1995, "deliberate" is no longer a required element of first degree murder. <u>See</u> 1995 Public Acts, Chapter 460; Tenn. Code Ann. § 39-13-202 (1997). Because the offense was committed after July 1, 1995, "deliberate" was not a required element of first degree murder. However, in this case the indictment incorrectly included the word "deliberately." We note that the appellant does not raise this issue on appeal, and, furthermore the trial court correctly instructed the jury on the post July 1, 1995 elements of first degree murder.

14

surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause death.

Tenn. Code Ann. § 39-11-302(b) (1991). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in irrational manner." Tenn. Code Ann. § 39-13-211 (1991).

Second degree murder and voluntary manslaughter are lesser included offenses of first degree murder. See Burns, No. 02S01-9806-CC-00058, 1999 WL 1006315, at *12; see also Tenn. R . Crim. P. 31(c). However, our inquiry does not stop here. Having concluded that second degree murder and voluntary manslaughter are lesser included offenses of first degree murder as charged in the indictment, we now must determine whether the lesser included offenses instruction regarding second degree murder and voluntary manslaughter should have been given.

Applying the principles set forth in Burns, we must first determine whether any evidence exists that reasonable minds could accept as to the lesser included offenses of second degree murder and voluntary manslaughter. In making this determination, we must view the evidence liberally in the light most favorable to the existence of the lesser included offenses without making any judgments on the credibility of such evidence. Burns, No. 02S01-9806-CC-00058, 1999 WL 1006315, at *14. After viewing the evidence in this light, the trial court should include the lesser included offense in the jury's instructions if any evidence exists that reasonable minds could accept as to the lesser included offense and if the evidence is legally sufficient to support a conviction for the lesser included offense. Id.

15

In the case at bar, the evidence is sufficient to support the appellant's conviction of premeditated first degree murder. However, from the evidence presented, reasonable minds could have determined that although the appellant knowingly killed the victim, the appellant did not act with premeditation, which is defined in Tennessee as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (Supp. 1995). Also, we conclude that the evidence presented would have been legally sufficient to support a conviction for second degree murder. In other words, if the trial court had charged the jury concerning second degree murder, and if the jury had found the appellant guilty of second degree murder, the conviction would withstand a challenge to the sufficiency of the evidence. For these reasons, we conclude that the trial judge erred by failing to instruct the jury as to the lesser included offense of second degree murder.

However, our supreme court has held that failure to instruct on a lesser included offense may be shown to be harmless error. State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998). In Williams, our supreme court stated:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Id. At 105 (emphasis added).

In the present case, even though the trial court should have charged the jury concerning the lesser included offense of second degree murder, we cannot conclude that the trial court's error affirmatively appears to have affected the result of the trial on the merits. In other words, we cannot conclude that the jury more probably than not would have found the appellant guilty of second degree murder if the jury had been given that option. Therefore, we conclude, under Williams, that

16

the error is harmless and that reversal is not required.

The appellant also contends that the evidence supported an instruction of voluntary manslaughter. We note the evidence reflected that the appellant calmly walked up to an unarmed man and shot him three times without any provocation from the victim, and then shot him once more after he was on the ground. We conclude there is absolutely no evidence in the record that the appellant was in a state of passion produced by adequate provocation. Therefore, the trial court correctly denied the appellant's request to instruct the jury on the lesser included offense of voluntary manslaughter. This issue is without merit.

**Motion to Suppress Identification Testimony**

The appellant contends that the trial court erred by denying his motion to suppress identification testimony. Specifically, the appellant objects to testimony by Simmons and Marshall relating to the photographic identifications of the appellant asserting that the photographic lineup was unduly suggestive and violated his due process rights.

On a motion to suppress, deference is given to the trial court to assess the credibility of the witnesses and determine issues of fact, and the prevailing party is entitled to the strongest legitimate view of the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The findings of fact of the trial court at a suppression hearing will not be disturbed on appeal unless the evidence preponderates otherwise. Id.

The law in Tennessee concerning lineup procedures is quite clear. "To be admissible as evidence, an identification must not have been conducted in

such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn.)(citing Simmons v. United States, 390 U.S. 377, 384 (1968)), cert. denied, 119 S.Ct 343 (1998). A lineup is considered unduly suggestive only when the other participants were "grossly dissimilar." State v. Turner, No. 01C01-9405-CC-00173, 1995 WL 293031, at *2 (Tenn. Crim. App. at Nashville, May 16, 1995) (citing United States v. Wade, 388 U.S. 218, 233 (1967)); see also State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993); Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978); Cross v. State, 540 S.W.2d 289, 290 (Tenn. Crim. App. 1976).

The appellant complains that the photographic lineup was unduly suggestive. The appellant states that on the night the victim was shot, the shooter was allegedly wearing dark clothing. Therefore, the appellant contends that the police should have used a photograph of the appellant in which he was not wearing dark clothing because of the possibility that the witnesses would make an erroneous identification of him based on his clothing. Moreover, the appellant argues that the photographic lineup should have been composed of more than two individuals wearing dark clothes. The appellant claims that the failure to include such additional photographs rendered the photographic array unduly suggestive and improper.

After reviewing the photographic lineup, we concur with the trial court's conclusion that the procedure was not unduly suggestive. The photographic lineup consisted of six Asian males who were approximately the same age with similar facial features. The appellant's claim that he was identified simply because he was shown wearing dark clothes is not supported by the record. The photographs showed the individuals from the chest up, therefore the clothes were not a distinguishing characteristic. Moreover, the photographic lineup contained another

18

man apart from the appellant wearing dark clothes. Finally, Marshall testified that he selected the appellant not because of his clothing, but because of his face. The persons included among the six photographs shown to the witnesses were not so "grossly dissimilar" in appearance as to violate applicable standards. Wade, 388 U.S. at 233. See Simmons v. United States, 390 U.S. at 384; Sloan v. State, 584 S.W.2d 461, 466-70 (Tenn. Crim. App. 1978); Shye v. State, 506 S.W.2d 169, 173-74 (Tenn. Crim. App. 1973). Thus, we agree with the trial court that although it may have been preferable to have all six men wearing the same color shirt, the fact that they were not does not mean that the lineup was unduly suggestive. State v. Lewis, No. 01C01-9604-CR-00162, 1999 WL 236434, at *8 (Tenn. Crim. App. at Nashville, April 23, 1999).

The appellant also argues that Marshall, because of his youth, may have been influenced by the fact that Simmons, his aunt, viewed the photographs first and identified the appellant. We note that there is nothing in the record to support this contention. Marshall stated that he did not see who Simmons identified and that he was not influenced by Simmons' selection. Marshall also testified at the suppression hearing and at trial that he independently identified the appellant as the shooter. The record reflects that at the time Marshall identified the appellant, he and Simmons were at different ends of the room. Moreover, Simmons stated that she had started to walk toward the restroom when Marshall made the identification. Furthermore, Marshall testified that he had previously seen the appellant in the neighborhood on three separate occasions. Thus, the record reflects that Simmons and Marshall independently identified the same man.

The Supreme Court has held that a pretrial identification procedure, even if suggestive, will not negate the identification of the appellant when it is

19

otherwise reliable. <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972). In <u>Biggers</u>, the Supreme Court identified five factors for assessing the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. <u>Id.</u>; <u>State v. Philpott</u>, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994); <u>State v. McAbee</u>, No. 01C01-9712-CR-00561, 1999 WL 398183, at *1-2 (Tenn. Crim. App. at Nashville, June 18, 1999).

Simmons and Marshall had ample opportunity to view the appellant at the time of the offense. Even though it was dark outside, Simmons and Marshall testified that the light from the street lights at the intersection was good. Simmons was standing five to six feet away from the shooter's face at the time of the shooting. Simmons stated she was "able to get a good look at his face." Marshall also stated that he "got a good look at his face."

The witnesses' degree of attention is evidenced by the nature of the crime and their detailed description of the events and the shooter. Simmons and Marshall both saw an Asian man shoot a man they knew in the intersection in front of Simmons' residence. Simmons and Marshall both stated that an Asian male wearing a dark shirt and dark pants walked from across the street armed with a "shiny pistol." Both witnesses stated that prior to this incident, they had seen the shooter in the neighborhood and later recognized the shooter as the appellant. Furthermore, both witnesses saw the appellant shoot the victim four times.

Prior to their identification at the photographic lineup, Simmons and

20

Marshall provided accurate descriptions of the shooter, although the descriptions were somewhat limited. At the suppression hearing and at trial, Simmons and Marshall described the shooter as an Asian male wearing a dark shirt and dark pants. They did not mention height, weight, age, hair color or length, or body type. Although the details were minimal, the limited description of the shooter matched the appellant. In light of the totality of the circumstances, we conclude that the accuracy of the witnesses' prior description of the perpetrator did not substantially affect the witnesses' ability to correctly identify the appellant as the shooter.

The level of certainty of the witnesses and the length of time between the crime and the identification also favor admissibility. Upon viewing the photographic lineup, Simmons and Marshall identified the appellant as the shooter in a matter of seconds. Simmons and Marshall also testified that they were certain that the appellant was the shooter. Moreover, the police conducted the photographic lineup on July 7, 1995, only three days after the shooting. This was clearly within enough proximity to weigh in favor of admissibility. See Forbes v. State, 559 S.W.2d 318, 322-23 (Tenn. 1977); State v. Carter, 682 S.W.2d 224, 226 (Tenn. Crim. App. 1984). Therefore, we conclude that the factors weigh heavily in favor of the reliability of the identification in the present case.

After reviewing the record, we conclude that the trial court did not err by denying the appellant's motion to suppress the identification testimony.

Accordingly, the judgment of the trial court is affirmed.

_____

Norma McGee Ogle, Judge

CONCUR:

_____

David H. Welles, Judge

_____

Thomas T. Woodall, Judge