IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 7, 2013

**STATE OF TENNESSEE v. TERRY FOSSETT**

**Appeal from the Criminal Court for Shelby County**
**No. 11-04212      John T. Fowlkes, Jr., Judge**

**No. W2012-00885-CCA-R3-CD  - Filed June 5, 2013**

The defendant, Terry Fossett, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and statutory rape by an authority figure, a Class C felony. He was sentenced to twenty-five years at 100% on the rape of a child conviction and three years as a Range I offender on the statutory rape conviction, to be served concurrently in the Department of Correction. On appeal, he argues that the evidence is insufficient to sustain his convictions and that the State should have obtained a psychological examination of the victim. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Ted I. Jones, Memphis, Tennessee, for the appellant, Terry Fossett.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton and Brooks F. Yelverton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted on charges of rape of a child and statutory rape by an authority figure arising out of his sexual encounters with his girlfriend's niece during the time periods of July 4, 2009 to May 24, 2010, and May 25, 2010 to March 8, 2011, respectively.

At trial, the victim testified that she was born on May 28, 1997, and that she "used to court," or "[g]o with," the defendant. The victim's aunt had custody of her, and the defendant was her aunt's boyfriend. She believed her aunt and the defendant started dating in 2009. The defendant visited their house and spent the night but did not live with them, although he had a key to the house. The victim said that the defendant acted like a father to her, explaining that he took care of her. She said that he helped out when they had "no heat or no food" and took her places. She said that he did things with her that she thought a father would do.

The victim testified that she let the defendant know that she was interested in having sex with him by giving him "a note" one day when he was at their house. However, the defendant told her that they had to wait because she was too young. She surmised that the defendant was interested in her by the way he looked at her, making her think that "he [was] the type of guy that [would] do that." The defendant also treated her differently than he treated her sister, by giving her money and junk food, and touching her shoulders and "rub[bing] all the way down to [her] butt." She turned twelve on May 28, 2009, and the rubbing incident and her giving the defendant the note happened before her birthday. The victim was afraid the defendant would tell her aunt about the note, which would get the victim into trouble, but to her knowledge he did not.

The victim testified that, in July 2009, "stuff started happening." The first encounter[1] occurred when the defendant arrived at their house on Smith Street while her aunt was "[a]t the club" and her sister was asleep. The victim was in the living room, and the defendant asked her if she was ready. Knowing that he was referring to having sex, the victim replied, "[Y]eah." They started kissing in the living room, but then proceeded to the victim's aunt's bedroom where "[h]e started unbuttoning his pants and then he told [her] to take [her] pants off." After undressing from the waist down, they lay down on the floor, and the defendant put on a condom. The defendant "kept asking [her] [if she was] ready" and then inserted his penis into her vagina, causing her pain. The defendant "was going up and down," and the victim kept her hands over her eyes because she was scared. She asked him to stop a couple of times "[b]ecause it was hurting," and he eventually stopped and went into the bathroom. When the defendant left, the victim went into the bathroom and then to her bedroom and started crying.

The victim testified that she loved the defendant and felt as though they had a relationship, but by September 2009, she wanted it to end. After getting into trouble at school, she told her aunt about her relationship with the defendant. The victim's aunt "put [the defendant] on the phone," which caused the victim to cry because her aunt did not

---

[1] The State elected this incident as the factual basis for the rape of a child charge.

believe her. The Department of Children's Services and police investigated, but the victim changed her mind about telling them what had been going on because "[she] wanted to start back doing it." The defendant told her, "[I]f you love me you'll tell them that we didn't do nothing," so she told her aunt and the juvenile court that nothing had happened between her and the defendant. She explained that she lied because she was "[t]aking up for him."

The victim testified that she and the defendant resumed their sexual relationship a couple of weeks after her recantation. By this point, the family had moved to a residence on Boston Street and the victim's grandmother was living with them, so she and the defendant had to be careful during their sexual encounters. The victim said that her aunt was never home when she and the defendant had sex because her aunt and the defendant left the house together, but then the defendant came back to the house alone. The defendant received calls from his wife and the victim's aunt while he and the victim were having sex and made excuses concerning his whereabouts, including telling the victim's aunt that he was taking his wife something to eat.

The victim testified that, following her recantation, she and the defendant had sex more frequently than before, approximately every other day. The defendant called or sent her text messages to tell her when he was going to come over to have sex. The victim used a cell phone her aunt left at the house to communicate with the defendant. The victim always deleted the defendant's messages after she read them.

The victim testified that the last time[2] they had sex was on February 5, 2011, which she remembered "[b]ecause that's the day [she] got pregnant." On that occasion, they had sex in the defendant's van to keep her grandmother from seeing or hearing them. Around 10:00 p.m., the defendant drove the van to a field down the street. As they were having sex, the defendant asked if he could take off his condom, and the victim said that she did not care. She recalled that the defendant told her that she "made him feel good" when they were having sex. She also recalled seeing a mole on the defendant's right arm when they were having sex; this area was usually covered by his shirt.

During the encounter in the van, the defendant gave the victim a camera and asked her to take pictures of her vaginal area and breasts. That night, she went into the bathroom and took pictures of herself. The defendant sent the victim a text message saying, "Make sure she in her room, don't get caught." The victim put the camera in the trunk of the defendant's car. The text message referred to her not getting caught while doing this. The cell phone died before the victim erased the message, and her aunt discovered it. The

_____

[2] The State elected this incident as the factual basis for the statutory rape by an authority figure charge.

victim's aunt asked her about the message, and she initially told her that she did not remember the text message or who sent it. However, she eventually told her aunt everything because she "already got caught up."

The victim testified that she had also given the defendant a second letter after their initial encounters seeking to have sex with him. Her aunt found both of the letters and was upset about them. The victim decided that she needed to stop lying for the defendant when she got caught and pregnant. She called the defendant to tell him that she was pregnant, and he hung up on her. On cross-examination, the victim acknowledged that she had lied to her family, the police, and social workers about her involvement with the defendant, but she explained that she "was taking up for [the defendant]." The victim also admitted that she never told the defendant to stay away from her.

The victim's aunt testified that she had raised the victim since she was three months old, and she was more like a daughter than a niece. She said that she and the defendant started dating in 2007 and dated for almost four years. The defendant never lived with her, but he was "with [her] everyday." In 2007, the victim's aunt, the victim, and the victim's sister lived in a house on Smith Street, and the defendant had keys to the house so he could come and go as he pleased. She said that the defendant acted like a father figure to the two girls, helping them with their homework, playing outside with them, and teaching the younger girl to ride a bicycle.

The victim's aunt testified that, in September 2009, the victim called her from school and told her that she needed to be picked up and also that "[the defendant] [had] been having sex with [her]." The defendant was in the car with her on the way to the school when the victim told her this, so she told the defendant what the victim had said and the defendant denied it. The defendant did not go into the school, but, when the victim got into the car, the defendant asked her why she was lying. As he dropped off the victim and her aunt, the defendant told the victim's aunt, "[S]ince she want to lie on me, I'm going to tell you something on her[.]" The defendant told the victim's aunt about the letters he had received from the victim. The defendant went to his house and retrieved two letters and brought them back to the victim's aunt. The defendant told her that he received the letters four or five months prior. She asked why he did not tell her about the letters when he received them, and "he just told [her] he didn't think it was important."

The victim's aunt testified that, following the victim's disclosure, she took the victim to the child advocacy center to have a medical examination and be interviewed. They also went to juvenile court where a no-contact order was entered between the victim and the defendant. The victim's aunt stopped dating the defendant during this time. About a month or two after the victim's disclosure, the victim told her aunt that "she had lied on [the

defendant]" because "she got tired of him telling on her, getting her in trouble[,] trying to be her daddy." All legal proceedings were stopped, and the victim's aunt started dating the defendant again.

The victim's aunt testified that on December 28, 2010, she and the girls moved into a house on Boston Street that the defendant helped her find, and her mother moved in with them. The defendant had keys to this house as well. During this time, the victim's aunt maintained two cell phones, one to keep with her and one to leave at the house with the victim in case she needed anything. The defendant's number was saved on the phone left with the victim under the name, "My Boo."

The victim's aunt testified that she and the defendant went to clubs together regularly, usually leaving around 9:00 to 11:00 p.m. and returning around 2:00 to 4:00 a.m. Every time they went out, the defendant left the victim's aunt at the club, saying "he got to go take his wife something to eat." He would then return to the club later and pick her up. The victim's aunt eventually became suspicious of the defendant always leaving to take his wife food.

In February 2011, the victim's aunt found a text message on the cell phone she left at the house that said "make sure she in her room and don't get caught." The victim's aunt confronted the victim about the message, and the victim initially "tried to lie . . . and tell [her] he didn't text it to her." However, the victim eventually told her "[t]hat he had text her that and told her to . . . make sure she don't get caught, he was telling her to get the camera out [of] the car. He had told her to take some pictures of herself."

The victim's aunt testified that she confronted the defendant about the text message, and he avoided her four or five times before he finally admitted sending the message but said it was referring to three dollars that he left in the mailbox for the victim. After the victim's revelation, the victim's aunt took her to a clinic and eventually discovered that the victim was pregnant.

On cross-examination, the victim's aunt testified that, considering the number of times the defendant left her when they were out together, she believed that he and the victim were having sex every other day. The victim's aunt acknowledged that she never witnessed any inappropriate behavior between the victim and the defendant.

With regard to the defendant's being a father figure to the victim and her sister, the victim's aunt stated that the defendant referred to himself as their father figure and would "do stuff for them." He helped the victim's aunt pay her phone and electric bills. On the weekends, the defendant drove the girls to and from the home of the victim's aunt's mother.

The victim's aunt recalled a time the defendant became angry with her because she would not share with him what she and the victim had been discussing. He told the victim's aunt, "[H]ow you think I'm going to be a father figure for them if you don't let me know what's going on with them[?]"

Dr. Edwin Morris Thorpe, an obstetrician and gynecologist, testified that he was the admitting physician at the Regional Medical Center on March 2, 2011, when the thirteen-year-old victim came in to be evaluated for problems during pregnancy. After a series of tests and confirmation by ultrasound, it was clear that the victim's pregnancy was not developing normally, requiring that the victim undergo a dilation and curettage procedure to remove the abnormal fetal products. Dr. Thorpe opined that, at that time, the victim had been pregnant for four to six weeks. The removed "products of conception" were sent for analysis.

Dr. Bo Scales, an expert in DNA analysis, testified that he tested the products of conception provided to him from the victim's procedure. He found no DNA profile in the specimen other than the victim's. He said that he had never tested a specimen from so early in a pregnancy. He also opined that the victim may have miscarried and passed the fetal material before she went to the hospital for the procedure. He said that a tubal pregnancy could have led to a lack of fetal material for DNA testing as well.

Officer Edward Cash with the Memphis Police Department testified that he responded to the victim's residence on Boston Street on February 10, 2011, and took a report in which the victim claimed to have been involved in a sexual relationship with the defendant for an extended period of time. The victim informed the officer that the last incident occurred in the defendant's van, parked in a vacant field near the family's home.

Ashley Piper, a nurse practitioner at LeBonheur Children's Medical Center, testified that she examined and interviewed the victim in September 2009 after her first allegation against the defendant. Her examination revealed no physical injuries to the victim's genital areas, but Piper noted that such findings were not uncommon especially considering that the victim had begun going through puberty. On cross-examination, Piper stated that counseling with the victim following the allegations was to be coordinated by Child Protective Services. She said that she was not called to follow up with the victim in 2010 or 2011.

After the conclusion of the proof, the jury convicted the defendant, as charged, of rape of a child and statutory rape by an authority figure.

## ANALYSIS

## I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the "muddled evidence in this case is not strong enough" to be legally sufficient and that the State did not prove that he was an "authority figure" as defined in Tennessee Code Annotated section 39-13-532.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their

demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" is "sexual intercourse, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Id. § 39-13-501(7). "[C]onsent is never a defense to a sex offense when the victim is less than thirteen years of age." State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994).

With regard to the rape of a child count, the State elected "the alleged act of sexual penetration on or after July 4, 2009, but occurring during July 2009 on the bedroom floor at [t]he Smith Street [a]ddress." The victim, having a birthday of May 28, 1997, would have been twelve years old in July 2009. At trial, the victim testified in detail about the first time she and the defendant engaged in sexual intercourse, which took place in July 2009 on the floor of her aunt's bedroom. The defendant contends that the lack of physical evidence makes it "seem[] implausible that the State's version of events would actually be true." However, our supreme court has concluded that the testimony of a child victim, alone, is sufficient to sustain a conviction for child rape. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003).

The defendant suggests that the evidence is "muddled" by the victim's giving him handwritten notes telling him that she wanted to have sex with him, and the victim's recanting her initial disclosure of their sexual relationship in September 2009. However, the victim's testimony indicated that she gave the defendant the letters because he treated her differently than her sister, at one point touching her shoulders and "rub[bing] all the way down to [her] butt," and he looked at her in a way that made her think "he [was] the type of guy that [would] do that." The victim's testimony also shows that she recanted, with the defendant's insistence, because she wanted to reconcile with him.

In sum, the victim's testimony establishes the elements of rape of a child, and her testimony was accredited by the jury. The evidence is sufficient for a rational trier of fact to find that the defendant committed rape of a child.

The defendant also argues that the State did not prove that he was an "authority figure," as defined in Tennessee Code Annotated section 39-13-532, to sustain his conviction for statutory rape by an authority figure. He asserts that, "[b]y being the [a]unt's boyfriend[,] [he] did not objectively or subjectively meet any of the statutory criteria."

Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when:

(1) The victim is at least thirteen (13) but less than eighteen (18) years of age;

(2) The defendant is at least four (4) years older than the victim; and

(3) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration; or

(4) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual penetration.

Tenn. Code Ann. § 39-13-532(a).[3]

With regard to the statutory rape by an authority figure count, the State elected "the alleged act of sexual penetration occurring on February 5, 2011 in the van which was located in the field on Boston Street."

The defendant's assertion that his status as the victim's aunt's boyfriend does not equate to a showing that he possessed parental or custodial authority over the victim is correct. However, the evidence in the record demonstrates that, in the light most favorable

---

[3] The "position of trust" provision, Tennessee Code Annotated section 39-13-532(a)(3), was not alleged in the indictment or charged to the jury.

to the State, the defendant's relationship with the victim was actually more akin to that of a stepfather having "parental or custodial authority" than a mere boyfriend of her aunt. The victim's aunt had had custody of the victim since she was three months old, and they referred to one another as "mama" and daughter. According to the victim's aunt, she and the defendant dated for almost four years and, while they were dating, she saw the defendant every day. The defendant had keys to their residence and could come and go as he pleased. According to the victim, the defendant ate dinner with them.

Moreover, the defendant referred to himself as a father figure to the victim and her sister, and the victim thought that the defendant acted like a father. The defendant helped the victim and her sister with their homework, played outside with them, and taught the victim's younger sister to ride a bicycle. The defendant helped the victim's aunt pay her phone and electric bills and helped them find the residence on Boston Street. The defendant drove the girls to and from their grandmother's house on the weekends.

Even though the defendant was not the victim's biological parent or legal custodian, such was not required. See, e.g., State v. Robert M. Deunes-Cruz, No. M2011-00879-CCA-R3-CD, 2013 WL 59341, at *10 (Tenn. Crim. App. Jan. 7, 2013) (affirming a stepfather's conviction for statutory rape by an authority figure); State v. Cleander Cleon Hartman, Jr., No. M2000-02441-CCA-R3-CD, 2002 WL 65996, at *6 (Tenn. Crim. App. Jan. 17, 2002) (In a sexual battery by an authority figure case, the court noted that the proof would have been sufficient for finding that the defendant had parental or custodial authority even though "[n]o evidence was presented that the defendant had legally adopted [the victim] or otherwise had any legal authority over her at the time the offenses were committed.").[4] The jury found that the defendant possessed parental or custodial authority over the victim and, in the light most favorable to the State, the record supports this conclusion.

## II. Psychological Examination

The defendant argues that the State should have conducted a psychological examination of the victim. He asserts that "[t]he possible motives, desires, and intentions of the victim seem wild and delusional, and they also came to the attention of the authorities long before the indictment." He claims "that from any fair reading of the actual record in this case the victim appears disturbed and contradictory – and for quite some time was not believed by the State."

---

[4] Due to the date of the offense, however, the "parental or custodial authority" provision was not applicable in Cleander Cleon Hartman.

The defendant candidly admits that the defense did not file a pretrial motion seeking an examination of the victim. Seemingly trying to explain this failure, the defendant "argue[s] and urge[s] that the proof at trial was even more enigmatic and unusual than could be anticipated, and that the victim and her family with their actions contradicted most, if not all, societal norms." He notes that he "brought this up as an issue in the motion for new trial because of the bizarre trial record which differed from discovery." However, the defendant never indicates, and there is no reference to the record to show, how the trial record differed from his discovery materials. It is presumable that the defendant received the two letters from the victim as discovery and, regardless, was fully aware of the letters as he was the one who provided them to the victim's aunt. Any motion seeking such an examination of a victim must be made on a timely basis, i.e., "'at any time after arrest but must be made in ample time so as not to result in a postponement or continuance of the final hearing.'" Forbes v. State, 559 S.W.2d 318, 321 (Tenn. 1977) (quoting State v. Gaddis, 530 S.W.2d 64, 69 (Tenn. 1975)). The defendant has waived consideration of this issue for failing to request an examination of the victim prior to trial.

Notwithstanding waiver, this issue is without merit. On appeal, the defendant does not allege what purpose an examination would serve. In his motion for new trial, the defendant alleged that an examination should have been conducted "to make sure that the truth was rendered in court and that [the victim] has an appreciation of all of the circumstances."

In Forbes, 559 S.W.2d at 321, our supreme court stated:

> We hold that in any case involving a sex violation, the trial judge has the inherent power to compel a psychiatric or psychological examination of the victim, where such examination is necessary to insure a just and orderly disposition of the cause. Such power should be invoked only for the most compelling of reasons, all of which must be documented in the record. This discretion should be exercised sparingly.

"Compelling reasons" include situations "where substantial doubt is cast upon the victim's sanity, or where there is a record of prior mental disorders or sexual fantasies, or where the story is incredible, and even in these situations, only if there is little or no corroboration to support the charge." State v. Ballard, 714 S.W.2d 284, 287 (Tenn. Crim. App. 1986). Ensuring that "the truth was rendered in court" is a concern in every case and to order an evaluation for such a reason would hardly be considered "discretion . . . exercised sparingly." Forbes, 559 S.W.2d at 321. There is simply no showing in the record of a compelling reason for the trial court to have ordered a psychological evaluation.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE